**UNITED STATES of America**

**v.**

**Gregory J. DePALMA, Eliot H. Weisman, Richard Fusco, a/k/a "Nerves", Murad Nersesian, a/k/a "Mike Fusco" and "Mickey Coco", Leonard Horwitz, a/k/a "The Fox", Laurence I. Goodman, Salvatore J. Cannatella, Louis Pacella, a/k/a "Louie Dome", Anthony Gaggi, a/k/a "Nino", and Thomas Marson, Defendants.**

**No. 78 Cr. 401.**

United States District Court, S. D. New York.

Sept. 21, 1978.

---

See also D.C., 461 F.Supp. 778.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City, by Nathaniel H. Akerman, Scott G. Campbell, Asst. U. S. Attys., New York City, for plaintiff.

Robert L. Ellis, New York City, for defendant DePalma.

Grand & Ostrow by Norman S. Ostrow and Frank H. Wright, New York City, for defendant Weisman.

Martin B. Adelman, New York City, for defendant Fusco.

Murray Richman, New York City, for defendant Nersesian.

Jonathan W. Lubell, New York City, for defendant Horwitz.

Litman, Friedman, Kaufman & Asche, New York City, for defendant Goodman by Herman Kaufman and Richard M. Asche, New York City, of counsel.

Segal & Hundley, New York City, for defendant Cannatella by Marvin B. Segal, New York City, of counsel.

Barry I. Slotnick, New York City, for defendant Pacella.

James M. LaRossa by John Mitchell, New York City, for defendant Gaggi.

Gregory J. Perrin, New York City, for defendant Marson.

## OPINION

SWEET, District Judge.

In an omnibus motion, all defendants in this multicount indictment alleging a pattern of racketeering activity and securities fraud and bankruptcy fraud conspiracies in connection with the operation of the Westchester Premier Theatre (the "Theatre") have moved, pursuant to Rule 41(b), Fed.R. Crim.P., and 18 U.S.C. § 2518(10)(a), for an order suppressing evidence obtained as a result of electronic surveillance authorized by five court orders:

a. An order signed March 10, 1977 by the Honorable Malcolm Lucas of the Central District of California ("Order # 1");

b. An order signed April 8, 1977 by Judge Lucas ("Order # 2");

c. An order signed May 5, 1977 by the Honorable Whitman Knapp of the Southern District of New York ("Order # 3");

d. An order signed June 21, 1977 by Judge Knapp ("Order # 4"): and

e. An order signed June 28, 1977 by Judge Knapp ("Order # 5").

The defendants have moved to suppress this wiretap evidence on the basis of the affidavits relied upon by the courts for issuance of the orders, failure of the Government to minimize properly the interception of nonpertinent communications, improper security surrounding the making and storage of tapes prior to sealing and failure to amend properly the orders.

In addition, defendant Weisman has moved to dismiss the indictment against him on the ground that the Government improperly utilized testimony Weisman had given in prior proceedings under an alleged grant of immunity. Weisman has also moved to suppress certain post-arrest statements made by him which the Government is alleged to have improperly obtained.

This court held hearings on August 8, 9, 10, 11, 28 and 29 with regard to factual issues raised by these motions. For the reasons stated below, defendants' motion to suppress evidence obtained through the five court ordered wiretaps is denied. The motions of defendant Weisman are granted with respect to certain statements and denied as to others.

The background of this action, including the allegations of the Indictment, have been set forth in this court's opinion of August 26, 1978 and will not be repeated here. As part of the Government's investigation of the alleged illegal activities which resulted in the instant Indictment, five wiretap orders, two in California and three in New York, were obtained and it is the fruits of these wiretaps which the defendants seek to exclude in this case.

## I. Defendants' Motions to Suppress Wiretap Evidence.

### The Sufficiency of the Affidavits.

The five wiretap orders were all issued pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, whose purpose "was effectively to prohibit, on the pain of criminal and civil penalties, all interceptions of oral and wire communications, except those specifically provided for in the Act, most notably those interceptions permitted to law enforcement officers when authorized by court order" in certain circumstances. United States v. Giordano, 416 U.S. 505, 514, 94 S.Ct. 1820, 1826, 40 L.Ed.2d 341 (1974). Central to this regulatory scheme is the requirement under 18 U.S.C. § 2518(3)[1] that a court issuing an intercept order must make the following specific findings. First, it must determine that probable cause exists in three distinct contexts: (a) an individual has or is about to commit an enumerated offense;[2] (b) communications concerning that offense will be obtained through such interception; and (c) the communication facilities intercepted are being used in connection with the commission of the offense by such individual. Second, the issuing court must determine that it is reasonably unlikely that normal investigative techniques would succeed if tried or would be too dangerous.

Defendants challenge the evidence obtained as a result of these wiretaps on two principal grounds. First, they challenge the sufficiency of the affidavits of the Government agents upon which the courts relied in issuing the wiretap orders as failing to establish the requisite probable cause. Second, they assert the affidavits failed to establish a need for electronic surveillance under Section 2518(3). Before turning to the specific objections, the background and scope of each of the court-authorized wiretaps will be set forth.

### Background of the Wiretaps.

In Order # 1, Judge Lucas authorized the interception of wire communications over two telephones located at the home of defendant Marson. In so doing, Judge Lucas found there was probable cause to believe that Marson and others (not including any defendants in this case) were committing various state and federal crimes consti-

---

1. 18 U.S.C. § 2518(3) provides that a court may authorize the interception of wire communications if the court determines on the basis of facts submitted to it that:

   "(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

   (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

   (c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

   (d) there is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of

such offense, or are leased to, listed in the name of, or commonly used by such person."

2. Section 2516 enumerates various federal offenses upon which a request for electronic surveillance may be based. Included within the list of enumerated offenses under Section 2516(1)(c) are the offenses of bribery of a public official (18 U.S.C. § 201), interference with commerce by threats or violence (18 U.S.C. § 1951), solicitation to influence operations of employee benefit plan (18 U.S.C. § 1954), interstate transportation of stolen property (18 U.S.C. §§ 2314 and 2315), and violations with respect to racketeer influenced and corrupt organizations (18 U.S.C. § 1963). Defendants do not contend that the offenses alleged in the five court-ordered electronic surveillance orders do not fall within the enumerated offenses of Section 2516(1)(c).

tuting a pattern of racketeering in connection with the supply of cleaning materials to Las Vegas hotels by a Las Vegas cleaning supply and service company; that there were communications over Marson's telephones concerning these activities; and that there was no reasonable likelihood that normal investigative procedures would be successful.[3] Judge Lucas' findings were based upon the affidavit of Special Agent Melvin L. Flohr of the Federal Bureau of Investigation ("FBI"), dated March 10, 1977.[4] The factual basis of Agent Flohr's affidavit is premised upon three confidential informants (denoted as Source One, Source Two and Source Three) who relayed, through other FBI agents, the substance of conversations had with, and observations of, Marson and others named in the order. Information obtained from these sources as set forth in Agent Flohr's affidavit alleged that cleaning supply and service contracts would be obtained from these hotels through threats to call outstanding loans or otherwise to cause problems at the hotels. Additionally, it was indicated that future cleaning supply and service contracts from other companies and state agencies would be obtained improperly. These sources also indicated that Marson used his residence telephones in seeking to accomplish these ends. All three sources were alleged to have had a history of credibility and trustworthiness.

In Order # 2, Judge Lucas authorized continued interception of communications over Marson's two telephones, finding probable cause to believe that individuals named in Order # 1 and six others were committing the same criminal violations alleged in Order # 1 constituting a pattern of racketeering activity which extended to the operations of an employee welfare benefit plan and improper means to collect extensions of credit; that wire communications concerning these offenses were occurring over Marson's telephones and that there was no reasonable likelihood that normal investigative procedures would succeed. Again, Judge Lucas based these findings upon the affidavit of Agent Flohr, dated April 18, 1977. Agent Flohr based the assertions in his affidavit upon information relayed to him through other FBI agents from Source Two and upon information gleaned from conversations intercepted under Order # 1. In particular, the affidavit alleged that intercepted conversations demonstrated that Marson stated he would send a "message" to an individual who owed him money in order to secure immediate repayment. Source Two informed FBI personnel that attempts were being made to obtain contracts for services by improper means. Intercepted conversations confirmed attempts by Marson and others to interest others in this effort. Source Two also reported that Marson and others continued to use threats or improper inducements to obtain contracts.

Judge Knapp issued Order # 3, authorizing the interception of wire communications over eight telephones located at the Theatre and one telephone at the Scarsdale, New York residence of defendant DePalma. Judge Knapp found reasonable cause to believe that Martin Eisner and defendants Marson, DePalma, Weisman and Cannatella

---

**3.** Order # 1, as well as all the other Orders which are the subject of this motion to suppress, was also based upon the appropriate authorizations from Attorney General Griffin Bell and Benjamin Civiletti, Assistant Attorney General, Criminal Division, as required by Section 2516.

Defendants have raised no challenge to the sufficiency of these authorizations. Cf. *United States v. Giordano, supra,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341.

**4.** This affidavit and the subsequent affidavit of Agent Flohr, dated April 18, 1977, submitted in support of the application for Orders # 1 and # 2 were unsealed on June 21, 1978 to enable discovery by the defendants to go forward. On June 23, 1978 an application by then counsel for defendant Marson to maintain the sealing with respect to these two affidavits was granted, and counsel and the parties were directed not to divulge their contents. A discussion of certain aspects of these affidavits is required in order to complete this opinion and solely to that extent, the order of this court of June 23, 1978 is modified. However, until any further application showing good cause the contents of the affidavits which assert hearsay information concerning criminal activity not related to this information shall remain sealed.

were defrauding Theatre creditors and that Marson, DePalma and Eisner were engaged in a pattern of racketeering activity constituting bankruptcy fraud and the interstate transportation of stolen property. Judge Knapp further found that communications concerning these activities were occurring over the telephones to be tapped and that there was no reasonable likelihood that normal investigative procedures would succeed. Order # 3 was based upon the affidavit of Special Agent Charges B. Walker of the FBI, sworn to on May 5, 1977. The factual assertions in Agent Walker's affidavit were premised upon information obtained through other FBI personnel, from conversations Source Two had with Marson and upon telephone conversations intercepted under Orders # 1 and # 2 which, according to the Government, corroborate the information given by Source Two. Specifically, Source Two asserted that he had been informed by Marson that Marson and DePalma had been skimming money out of the Theatre's operations from concessions and ticket sales which were not reported on the Theatre's books and that as a result of Chapter XI proceedings, the presence of auditors at the Theatre had made this skimming operation more difficult. Source Two also asserted Marson and DePalma had daily telephone contact concerning this scheme. Telephone conversations intercepted pursuant to Orders # 1 and # 2 were cited by the Government as indicating that Marson and others were removing or attempting to remove money from the Theatre pending Chapter XI proceedings; that moneys were being skimmed from Theatre revenues; and that Marson and Weisman discussed the filing of a false financial statement for the Theatre.

Order # 4, authorizing the continued interception of communications over DePalma's residential telephone, was issued by Judge Knapp upon a finding that probable cause existed to believe that the same individuals named in Order # 3 plus one "Richie", believed to be defendant Richard Fusco, were committing the same criminal violations set forth in Order # 3; that conversations concerning these activities were occurring over DePalma's telephone and that there was no reasonable likelihood that normal investigative procedures would be successful. Judge Knapp's order was based upon the affidavit of Special Agent Robert Tolan, dated June 21, 1977, which in turn relied upon two confidential informants, denoted as Source One and Source Two.[5] Source One relayed through other FBI agents the substance of conversations he had had with a reputed figurehead in organized crime concerning loans made to a party connected with the Theatre at substantial rates of interest. Such loans would then be repaid out of Theatre proceeds. Source Two related, through other FBI agents, the substance of conversations with, and observations of, Weisman, DePalma and Fusco which indicated that these parties were systematically skimming large sums of money from the Theatre. Both Source One and Source Two were alleged to be reliable. In addition, Agent Tolan relied upon conversations intercepted pursuant to Order # 3 concerning various methods by which Marson, DePalma and others were attempting to recoup their investments in the Theatre pending the Chapter XI proceedings and past attempts to obtain proceeds of Theatre sales which were not recorded in Theatre books.

Order # 5, authorizing the interception of a Theatre telephone and a second telephone at the DePalma residence, was issued by Judge Knapp upon a finding of probable cause to believe that the subjects named in Order # 4 were committing the violations set forth in Orders # 3 and # 4; that communications concerning these activities were occurring over those telephones; and that there was no reasonable likelihood that normal investigative procedures would succeed. In support of Order # 5, the Government submitted the affidavit of FBI Special Agent Joseph Keating, dated June 28, 1977. Agent Keating's affidavit repeated much of the same information contained in Agent

5. These two informants are apparently different individuals than those previously referred to as Source One and Source Two in Orders # 1, # 2 and # 3.

Tolan's affidavit, but in addition set forth information obtained from Source Two concerning the regular use made by DePalma of his second residential telephone and of his private line at the Theatre in connection with the criminal activities stated in the order. Agent Keating's affidavit also relied upon conversations intercepted pursuant to Order # 2, indicating that these two additional lines were used by DePalma for the criminal activity stated in the order.

Marson and Pacella, Fusco and Cannatella seek to suppress the evidence obtained as a result of the wiretaps on the basis that the orders are not supported by either probable cause or a particularized need under Title III.[6] Additionally, these defendants assert that the issuance of Order # 1 was invalid under Title III and thus interceptions from Order # 1 may not be used to establish probable cause for subsequent applications. 18 U.S.C. § 2515. *See, Wong Sun v. United States,* 371 U.S. 471, 491, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), *United States v. Wac,* 498 F.2d 1227, 1232 (6th Cir. 1974).

In ascertaining whether the Government has provided sufficient probable cause to a court issuing an order of electronic surveillance, a finding of probable cause made by the issuing court on the basis of detailed affidavits "is entitled to deference by a reviewing court." *United States v. Londono,* 553 F.2d 805, 810 (2d Cir. 1977). *See also Aguilar v. Texas,* 378 U.S. 108, 111, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *In re Persico,* 362 F.Supp. 713 (E.D.N.Y.1973). Additionally, affidavits submitted in support of court orders for electronic surveillance must be viewed by the court as a whole and "in a practical and commonsense fashion." *United States v. Steinberg,* 525

F.2d 1126, 1130 (2d Cir. 1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976), citing S.Rep.No.1097, 90th Cong., 2d Sess., 1968 U.S.Code Cong. & Ad.News, pp. 2112, 2190. *See also United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *United States v. Schwartz,* 535 F.2d 160, 163 (2d Cir. 1976), *cert. denied,* 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 581, *reh. denied,* 430 U.S. 976, 97 S.Ct. 1669, 52 L.Ed.2d 371 (1977). Of course, probable cause cannot be made out by affidavits which are purely conclusory; an affidavit stating an affiant's or informant's belief that probable cause exists must recite the underlying circumstances upon which that belief is based. *United States v. Ventresca, supra,* 380 U.S. at 108–109, 85 S.Ct. 741.

*The Lack of Probable Cause*

All of the defendants assert that the wiretaps were issued upon an insufficient showing by the affiants of probable cause.[7] Because Order # 1 relies most heavily upon informant information, defendants' attack is concentrated primarily upon assertions that the various informants, whose testimony was utilized in Agent Flohr's twenty-eight page affidavit to establish probable cause, were unreliable. Additionally, the defendants assert that much of the information supplied by these informants was stale and thus should not have been relied upon in determining probable cause.

In *Aguilar v. Texas, supra,* the Court set forth a two-pronged test to evaluate affidavits based upon informant information: (1) the affidavit must state in sufficient detail the underlying circumstances upon which the informant bases his infor-

---

6. Apparently, defendants' motions are submitted under Section 2518(10)(a)(i) which allows "any aggrieved person" to move to suppress the contents of intercepted wire communications on the ground that the communication was unlawfully intercepted. *See United States v. Giordano, supra,* 416 U.S. at 526, 94 S.Ct. 1820.

7. "Probable cause" as used for the basis of court-ordered electronic surveillance was perhaps best defined by the Court in *Berger v.*

New York, 388 U.S. 41, 55, 87 S.Ct. 1873, 1881, 18 L.Ed.2d 1040 (1967):

"Probable cause under the Fourth Amendment exists where the facts and circumstances within the affiant's knowledge, and of which he has reasonably trustworthy information, are sufficient unto themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed."

mation; and (2) the informant must be credible or the information must be reliable. 378 U.S. at 114, 84 S.Ct. 1509. *See also Franks v. Delaware,* 437 U.S. 154, 164, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667 (1978); *Spinelli v. United States,* 393 U.S. 410, 416, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Although courts are often called upon to make "fine judgments . . . to determine whether an affidavit states facts sufficient to show probable cause" for issuance of a wiretap order, *see United States v. Karathanos,* 531 F.2d 26, 29 (2d Cir.), *cert. denied,* 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976), Agent Flohr's affidavit and its use of three confidential sources meets the *Aguilar* test.

Agent Flohr's affidavit adequately set forth the underlying circumstances which formed the basis of the informants' information. All three sources based their information upon statements and admissions made to the sources by Marson and others named in Order # 1 which indicated the use of threats and other improper methods to obtain supply and service contracts. Moreover, through personal observations by Source Two, it was established that Marson used the telephone numbers named in the order to achieve these ends.[8] In such circumstances, personal observation by the informant is sufficient to establish both the reliability of the information, *United States v. Rollins,* 522 F.2d 160, 164 (2d Cir. 1975), *cert. denied,* 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1976), as well as probable cause to believe that the telephones were used for the asserted purposes, *United States v. Finn,* 502 F.2d 938, 941 (7th Cir. 1974).

Moreover, to the extent possible, the information given by the sources was corroborated by the independent accounts of the sources themselves, by independent investigation by FBI personnel of telephone records, as well as through public documents and interviews. More specifically, allegations that Marson used his home telephones to participate in the operations were sup-

ported by an examination of telephone toll records which indicated that numerous telephone calls were made between Marson's residence and others named in the order. Examinations of public documents revealed the existence of loans and the sale of certain supplies to several Las Vegas hotels. Public records also disclosed that one of the principals named in the order was an officer of a company involved in such sales. Finally, FBI interviews with other sellers revealed a pattern of threats and interference with their business position. Taken as a whole, Agent Flohr's affidavit is sufficient to establish probable cause. *United States v. Esposito,* 423 F.Supp. 908, 911 (S.D.N.Y. 1976).

Finally, each of the informants had a history of furnishing truthful and reliable information. *United States v. Esposito, supra.* Source One and Source Two furnished information to the FBI for twelve and nine years, respectively, which led to numerous arrests and convictions as well as the recovery of substantial amounts of property. Source Three was stated to have supplied information for several years leading to numerous arrests and the recovery of substantial amounts of property. All three sources had a history of corroboration by physical and court-ordered electronic surveillance. These circumstances established the credibility of the sources.

■■ Defendants also challenge the continued use in Agent Flohr's affidavit of multiple hearsay. Almost without exception, each of the informants' reports, upon which the Government relied to establish probable cause, was based upon conversations had with individuals in the order, which conversations were reported to an FBI agent and were in turn conveyed to Agent Flohr. Multiple hearsay does not automatically make an affidavit insufficient to supply probable cause; rather, the central issue remains whether the informant's information received in the totality of circumstances can reasonably be said to

---

8. Similarly, Source Three called Marson on one of Marson's home telephone numbers and related that Marson discussed the operations of

the Las Vegas cleaning supply and service company and the need for potential company customers.

be reliable. *United States v. Fiorella,* 468 F.2d 688, 691 (2d Cir. 1972), *cert. denied,* 417 U.S. 917, 94 S.Ct. 2622, 41 L.Ed.2d 222 (1974). Where a substantial basis exists for crediting the hearsay, the finding of probable cause will not be invalidated. *United States v. Agrusa,* 541 F.2d 690, 694 (8th Cir. 1976), *cert. denied,* 429 U.S. 1045, 97 S.Ct. 751, 50 L.Ed.2d 759 (1977). Here, all three confidential sources were demonstrated to have been credible and reliable. It has been recognized in this circuit that although the use of multiple hearsay in such cases "is not to be encouraged", given the circumstances of this case, "and the fact that the middle man in the hearsay chain was a named FBI agent . . . the affidavit provides probable cause for the wiretap order." *United States v. Fiorella, supra,* 468 F.2d at 691–2.

■ A more difficult problem is presented by the use in Agent Flohr's affidavit of what is contended by the defendants to be "stale" information. In particular, defendants attack the use made by Agent Flohr of information obtained from Source One almost nine months prior to the application for Order # 1 relating to Marson's connection with the scheme for obtaining contracts improperly. Also attacked is Agent Flohr's use of information obtained from Source Two some six weeks prior to application for Order # 1, relating to Marson's involvement and the use of Marson's two residential telephones concerning the scheme.

In *Sgro v. United States,* 287 U.S. 206, 53 S.Ct. 138, 77 L.Ed. 266 (1932), the Court held that proof of probable cause "must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." 287 U.S. at 210, 53 S.Ct. at 140. However, the Court noted that "[w]hether the proof meets this test must be determined by the circumstances of each case." *Id.* at 210–211, 53 S.Ct. at 140. Thus, although probable cause must exist at the time application for court-ordered surveillance is made, "[t]he question of the staleness of probable cause depends more on the nature of the unlawful activity alleged in the affidavit than the dates and times specified therein." *United States v. Harris,* 482 F.2d 1115, 1119 (3d Cir. 1973). In *United States v. Johnson,* 461 F.2d 285, 287 (10th Cir. 1972), the court noted that "the vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts relied upon and the issuance of the affidavit. . . . [W]here the affidavit properly recites facts indicating activity of a protracted and continuous nature, a source of conduct, the passage of time becomes less significant." *See also United States v. Hyde,* 574 F.2d 856, 865 (5th Cir. 1978) (issue of staleness "must be examined more liberally when a continuing pattern of criminal activity is alleged"). Agent Flohr's affidavit indicates the participation of Marson and others in the establishment and operation of the scheme to obtain contracts improperly over a nine-month period, confirmed in part by the FBI's own investigation over the period. Because of the nature of this protracted and continuous operation, and the obvious sensitivity of the investigation necessary to obtain confirmation of the scheme, this court does not find the information given by Source One and Source Two to be stale to the point of requiring suppression. *See United States v. Harris, supra,* 482 F.2d at 1119; *United States v. Fina,* 405 F.Supp. 267, 274–275 (E.D.Pa.1975).[9]

■ In attacking the absence of probable cause in the remaining orders, the defendants have laboriously dissected into minute

---

9. Defendant Pacella has argued that the affidavits upon which these wiretap orders are based were issued in violation of the Justice Department twenty-one day "freshness rule." Under this rule " 'no more than three weeks may transpire between the date of the *last* information relating to probable cause in the affidavit and the time the affidavit itself reaches the Attorney General's desk for approval' [emphasis added.]" *Report of the National Commission for the Review of Federal and State Laws Relating to Wiretapping and Electronic Surveillance* at p. 63 (1976). Pacella, however, has not pointed to any evidence which establishes that this twenty-one day rule has been violated.

detail the lengthy affidavits submitted in support of those orders. Notwithstanding, there is no reason to disturb the findings of probable cause made by Judge Lucas and Judge Knapp in the remaining orders.

As stated in Marson's brief, Agent Flohr's forty-three page affidavit of April 18, 1977, submitted in support of Order # 2, relies almost entirely upon evidence obtained as a result of Order # 1, which has been found to have been validly based on probable cause. Considering both the information accrued as a result of Order # 1 and the information recounted in Agent Flohr's affidavit, ample evidence was presented to justify Judge Lucas' finding of probable cause with respect to Order # 2. Intercepted communications of Marson and others named in Order # 2 concerned interference with commerce by threats or violence, bribery, solicitation to influence the operations of a benefits plan and improper means to collect extensions of credit. Of course, intercepted conversations may be used to establish probable cause for the renewal of a wiretap order. *United States v. Fury,* 554 F.2d 522, 530–31 (2d Cir.), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977). Moreover, Source Two, whose credibility has already been established, confirmed the use of improper means to obtain contracts through personal conversations with Marson. Finally, the intercepted conversations themselves provide ample proof of the use of Marson's telephones to achieve these ends. Agent Flohr's affidavit also demonstrates that continuation of Order # 1 was required in order to further identify and define the roles of individuals in the scheme uncovered in intercepted conversations under Order # 1, and thus meets the requisites of Section 2518(1)(f).

Similarly, Agent Walker's twenty-six page affidavit, submitted in support of Order # 3, and which relies primarily upon confidential informants and communications intercepted pursuant to Orders # 1 and # 2, is attacked for lack of probable cause in its assertion that the parties named in the order were committing offenses including interstate transportation of stolen property, bankruptcy fraud and racketeering. Again, probable cause has been established. Intercepted communications indicated that Marson, DePalma and others attempted to falsify financial records at the Theatre and attempted to remove money from the Theatre through "gimmicks" which would not be discovered by Theatre auditors. Source Two, whose credibility has already been considered, advised Walker through another FBI agent that in conversations with Marson, Marson admitted "skimming money off the top" from Theatre operations with DePalma's assistance and these proceeds were forwarded to Marson in California. Moreover, Source Two stated that DePalma called Marson daily from the Theatre or his residence to keep Marson advised of Chapter XI proceedings involving the Theatre and of attempts to get money out of the Theatre. Source Two's statements are reliable, having been corroborated by intercepted conversations and, to the extent possible, independent FBI investigation. For example, an examination of public records indicated that the Theatre had recently filed Chapter XI proceedings. In addition, telephone company records indicated several calls between Marson and the Theatre. Previously intercepted conversations established DePalma's role in the operation of the Theatre and his attempts to remove money from the Theatre during the pendency of the Chapter XI proceedings. Moreover, the intercepted conversations also set forth the role of Marson and Cannatella in attempting to remove money from the Theatre and the attempts of Marson and Weisman to conceal such activities from Theatre creditors.

Finally, Cannatella's claim that there was no probable cause for believing that the Theatre phones would be used for criminal conversations is refuted both by Source Two's statement that DePalma called Marson daily from the Theatre and by communications intercepted pursuant to Orders # 1 and # 2 which indicated that Theatre telephones were being used for discussions concerning a false Theatre financial statement and the desire to run the Theatre into

bankruptcy in order to avoid paying creditors.

Agent Tolan's twenty-eight page affidavit in support of Order # 4 also sufficiently establishes probable cause to continue for a thirty-day period electronic surveillance on DePalma's residential telephone. Conversations intercepted as a result of Order # 3 demonstrate probable cause that Marson, DePalma, Eisner, Weisman and Cannatella were participating in offenses involving bankruptcy fraud; that Marson and DePalma were participating in offenses involving interstate transportation of stolen property; and that Marson, DePalma and Eisner were participating in offenses involving racketeer-influenced and corrupt organizations. Moreover, it was established through intercepts made pursuant to Order # 3 that conversations concerning these activities took place over DePalma's residential telephone. Specifically, intercepted conversations showed that during the pendency of the Chapter XI proceedings sums of money were being diverted from proceeds of the Theatre to pay selected individuals including Marson, DePalma, Weisman and Cannatella. There was also evidence that certain Theatre tickets were sold without reporting the proceeds on the Theatre's books and records. A confidential informant, described by Agent Tolan as Source One, connected DePalma with Theatre operations and with loans made to DePalma by organized crime figures. Because meetings between DePalma and organized crime figures were corroborated by FBI surveillance and because of Source One's history of reliability, Source One's information passes muster under the *Aguilar* test.[10]

Finally, Agent Tolan's affidavit demonstrated the need for continued surveillance over DePalma's telephone under Section 2518(1)(f). Although significant amounts of information regarding the activities in Order # 4 had been gleaned from Order # 3, the full extent and scope of the criminal activity had not been uncovered. Individuals who had been mentioned by those named in the order were not fully identified, nor were their full roles in the Theatre operation known. As observed by Agent Tolan, only the tip of the iceberg of criminal activity had been uncovered. Accordingly, extension of the wiretap on DePalma's telephone was warranted.

Similarly, Agent Keating's thirty-four page affidavit established sufficient probable cause for the issuance of Order # 5 which authorized electronic surveillance over a telephone at the Theatre and over a second telephone at the DePalma residence.

---

**10.** Defendant Fusco attacks the reliability of Source Two, also relied upon in Tolan's affidavit, on the basis of his criminal record, his lack of historical credibility and his allegedly having provided incorrect information concerning Fusco's telephone number. Although Source Two's information concerning the telephone number may have been incorrect, his overall reliability has not been vitiated. Much of what Source Two asserted was corroborated by information from other confidential sources—e. g., loans from organized crime figures being repaid out of Theatre proceeds and the "skimming" of proceeds from Theatre operations. Additionally, Source Two correctly identified two home telephone numbers used by DePalma and stated that DePalma could be regularly reached at a private Theatre telephone. Finally, Source Two's allegations of "skimming" were corroborated by intercepted conversations which indicated that "extra seat money" was being siphoned out of the Theatre and that other individuals were attempting to recoup their investments in the Theatre pending Chapter XI proceedings.

Despite the apparent error by Source Two in listing the telephone number of Fusco, the remainder of Source Two's information appears sufficiently corroborated to be reliable. Because of his over-all reliability, the fact that he had no history of credibility will not impugn the validity of the affidavit.

Where independent corroboration of Source Two's information exists through statements of other informants and intercepted conversations, sufficient indications of the informer's reliability has been established. *See United States v. Harris*, 403 U.S. 573, 581–2, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971) (averment of previous reliability unnecessary where informant's present reliability is established); *United States v. Sultan*, 463 F.2d 1066, 1069 (2d Cir. 1972) ("An untested informant's story may be corroborated by other facts that become known to the affiant, even if they corroborate only innocent aspects of the story"). *See also United States v. Tortorello*, 342 F.Supp. 1029, 1037 (S.D.N.Y. 1972), *aff'd.*, 480 F.2d 764 (2d Cir.), *cert. denied*, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973).

Agent Keating's affidavit repeated much of the information given in Agent Tolan's affidavit which established probable cause that the named subjects were participating in criminal activity in connection with the Theatre's operation. Additionally, Agent Keating's affidavit established the requisite probable cause that an additional telephone at the DePalma residence and a Theatre telephone were used for this purpose. Several intercepted conversations referred to the use of these telephone lines by DePalma, and FBI investigators confirmed the telephones were subscribed to by DePalma and the Theatre, respectively.

Accordingly, no reasons have been presented to disturb the findings of Judge Lucas and Judge Knapp that sufficient probable cause existed to issue the wiretaps authorized by Orders # 1 through # 5.

*The Availability of Alternative Investigatory Techniques.*

█ Section 2518(3)(c) also requires that a finding that normal investigative procedures reasonably appear unlikely to succeed if tried or to be too dangerous. Defendants Marson, Cannatella, Pacella and Fusco attack the findings made before the issuance of each wiretap order on this basis.

It has already been observed in this circuit that:

the purpose of these "other investigative techniques" requirements "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." Moreover, the required showing is to "be tested in a practical and commonsense fashion." In short, the requirement is "simply de-

signed to assure that wiretapping is not resorted to in situations where traditional investigation techniques would suffice to expose the crime."

*United States v. Fury, supra,* 554 F.2d at 530 [citations omitted]. As stated by the court in *United States v. Spagnuolo,* 549 F.2d 705, 710 (9th Cir. 1977):

[A]n affidavit is not insufficient because it did not prove beyond a shadow of a doubt that ordinary techniques will fail or that their use will result in a loss of life or some equivalent disaster. The standard of reasonableness should be employed in measuring the affidavit against the statutory requirements.

Thus, for an affidavit to be invalid under Section 2518(1)(c), there must be more than "the remote possibility that other investigative paths might lead to the desired evidentiary result." *United States v. Baker,* 443 F.Supp. 526, 530 (S.D.N.Y.1977).

Measured against these standards, the court finds Agent Flohr's affidavit submitted in support of Order # 1 sufficiently demonstrated the reasonable unlikelihood of success of alternative methods. Agent Flohr's affidavit recounted the difficulty of personal surveillance on Marson's home by reason of its secluded and carefully guarded location.[11] All three confidential sources stated they would not testify because of fear for their own personal safety and, if granted immunity, Sources Two and Three would not be able to give direct testimony against those who control Marson's activities. Infiltration of the group named in the order was attempted by undercover agents but this proved fruitless; although other infiltration was to be attempted through the establishment of a competitive company vis-a-vis the Las Vegas cleaning supply and service company, this was considered dan-

---

11. During the course of these hearings, Agent Walker, who was Special Agent in charge of monitoring the California wiretaps, admitted on cross examination that "on a couple of occasions" other agents were successful in gaining physical surveillance on the Marson home through back roads leading to his residence. This testimony does not contradict the lack of success of physical surveillance alleged in

Flohr's affidavit. Physical surveillance, even if successful, could only confirm the comings and goings of parties named in the order; it would not allow agents to obtain knowledge of what was discussed in the meetings. Moreover, Walker's statement does not contradict Flohr's assertion that physical surveillance had only "rarely" proven successful.

gerous and only of limited value in view of the fact that no source could provide information that documentary evidence existed which could be used against the individuals.

In the circumstances related by the Flohr affidavit, no logical alternative is apparent or has been alleged to ascertain the details of the operation or Marson's connection with it. Moreover, where, as here, it appears Marson's telephone was routinely relied upon to conduct the business of the scheme wiretapping is particularly appropriate. *See United States v. Steinberg, supra,* 525 F.2d at 1130. Accordingly, Flohr's affidavit passes statutory muster under Section 2518(1)(c).[12]

Similarly, Agent Flohr's affidavit in support of Order # 2 sufficiently demonstrates the reasonable likelihood that alternative investigatory techniques would not succeed. Physical surveillance was of only limited utility in view of the caution with which the participants conducted their affairs in public and could do no more than confirm the comings and goings of the participants. Infiltration was attempted but proved insufficient to acquire evidence beyond the lower levels of the operation. Moreover, the participants often conferred with each other in

guarded language and the identity of possible other conspirators and their roles were not clearly defined. With the need for continued interception demonstrated here, Order # 2 was validly issued.

Agent Walker's affidavit in support of Order # 3 also demonstrated the need for interception. Sufficient evidence did not exist for prosecution of the individuals in the order and no available sources could demonstrate the existence of documentary evidence which could be seized through a search warrant. Physical surveillance of the individuals in private offices inside the Theatre was impossible. Source Two reiterated his refusal to testify at grand jury proceedings even if granted immunity and expressed fear for his personal safety. Infiltration was not a viable alternative because of the close relationship between the participants and the geographical distance between them (California, New York and Michigan).

The affidavits submitted in support of Orders # 4 and # 5 also sufficiently demonstrate the unavailability of normal investigative techniques under Section 2518(3)(c). Infiltration, by reason of the close financial

12. Defendants Marson and Pacella place great reliance upon *United States v. Kalustian,* 529 F.2d 585 (9th Cir. 1975) in support of their position that Agent Flohr's affidavit gave insufficient information as to why normal investigative procedures would be unlikely to succeed in violation of Section 2518(1)(c). In *Kalustian,* the court held that an affidavit based upon the affiant's supposition that such normal investigative techniques as surveying telephone toll records, physical surveillance and premises and body searches would be unlikely to succeed by reason of the past knowledge and experience of the affiant was insufficient under Section 2518(1)(c). Indeed, aside from past experience, the affiant could only offer the failure of informants to testify in support of his position that no alternative investigative techniques were available which, the court noted, "standing alone . . . may not be sufficient." 529 F.2d at 589. Thus, the court found that the "application did not adequately show why traditional investigative techniques were not sufficient in this particular case." *Id.* at 590.

In *United States v. Spagnuolo, supra,* 549 F.2d 705, the Ninth Circuit reiterated the *Kalustian* standard that "[a]n affidavit composed solely of conclusions unsupported by particular facts"

fails to meet the Section 2518(1)(c) standard. 549 F.2d at 710. However, the court noted that where the affidavit reveals "that normal investigative techniques have been employed in a good faith effort to determine the identity of those violating the law and to assemble sufficient evidence to justify their prosecution and that these efforts have failed to achieve these ends," Section 2518(1)(c) is satisfied. *Id.* Thus, the court refused to suppress electronic evidence obtained after infiltration by an undercover agent had been tried and failed. *Id.* at 711.

This court finds Agent Flohr's affidavit falls within the holding of *Spagnuolo* and not *Kalustian.* Here, physical surveillance, analysis of telephone company records and undercover infiltration had been tried and failed. These efforts by the Government conclusively demonstrate that normal investigative techniques would be useless against the wide-ranging criminal activity described. *Kalustian* is thus inapposite. Moreover, *Kalustian* has been specifically rejected by at least one court as not reflecting the law of this circuit. *United States v. Caruso,* 415 F.Supp. 847, 852 (S.D.N.Y.1976), *aff'd.,* 553 F.2d 94 (2d Cir. 1977).

relationship between those named in the orders and because they are separated by large distances, was stated to be unlikely to succeed. Confidential sources were unwilling to testify even if granted immunity and expressed fear for their personal safety. Additionally, identification of the sources would compromise other investigations. Physical surveillance was limited to merely placing individuals together at a certain time and could give no information as to what was discussed.

Accordingly, the court finds the affidavits demonstrated a sufficient need for the use of electronic surveillance under Section 2518(1)(c).

*The Veracity of the Affidavits.*

Marson has argued that both affidavits submitted by Agent Flohr in support of Orders # 1 and # 2 contain "misstatements and omissions of material fact" because exculpatory material concerning undercover meetings with certain named subjects of the orders and an FBI agent had not been supplied to Judge Lucas. In paragraph 34 of Flohr's April 8, 1977 affidavit, Flohr, using information obtained through Special Agent Richards, described such a meeting on March 2, 1977. At that meeting, Richards presented himself as an individual who could obtain a contract for supplies by improper methods. Those participating in the meeting, according to Richards, stated that a California corporation would be established by which payments obtained from overbilling would be made, a procedure similar to the scheme already being used elsewhere.

An affidavit dated August 4, 1978 by one of those present contests Flohr's representation of the facts. It is stated that Richards represented that he could "sell a lot of chemicals" to the City of Long Beach because he could "get to these officials and office holders." Aff. August 4, 1978, ¶ 8. It was asserted that both participants:

> emphatically informed Mr. Richards that [the Las Vegas cleaning supply and service company] was not at all interested in paying off or offering bribes or kickbacks

to any governmental officials or to anyone for that matter, nor trying to go in through the back doors in any illegal manner and, further, that [the Las Vegas cleaning supply and service company] was running a clean operation, had done so in the past, and intended to do so in the future, and that, clearly, neither [the Las Vegas cleaning supply and service company] nor Dan Levine nor affiant were interested in any such kind of indicated illegal activity.

Aff. August 4, 1978, ¶ 9. Subsequent to this assertion, however, it was admitted that a business arrangement was reached with Richards whereby a California corporation would be formed to sell products "with the understanding that the California operation would not enter into any illegal activities." Aff. August 4, 1978, ¶ 10.

The affidavit then recounts a later meeting during May, 1977 held with two undercover FBI agents, concerning the possibility of manufacturing and distributing a soap product for a New Mexico corporation in New Mexico. The affidavit, as well as a second affidavit also dated August 4, 1978, stated that the affiants had stated in this meeting that they wanted no part of any illegal activities.

■ A search warrant issued on the basis of an affidavit must be voided where a defendant can demonstrate (1) the affidavit contains statements which are intentionally false, or were made with reckless disregard of the truth and (2) without the false statements, the affidavit lacks probable cause for issuance of the warrant. *Franks v. Delaware, supra,* 98 S.Ct. at 2676–7. First, Marson can demonstrate no intentionally or recklessly false statement in the Flohr affidavits. Obviously, the understanding of the affiant present at the March meeting with Roberts differed from the understanding presented from Roberts in Flohr's April 8 affidavit. However, in order for a false statement to be intentional or reckless, such statement must be within the affiant's personal knowledge. *See Rugendorf v. United States,* 376 U.S. 528, 532, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964). As the

Court noted in *Franks,* "*Rugendorf* emphasized that the 'erroneous statements . . . were not those of the affiant'; and thus 'fail[ed] to show that the affiant was in bad faith or that he made any misrepresentation to the Commissioner in securing the warrant.' [Citation omitted.]" 98 S.Ct. at 2680. *See United States v. Sultan,* 463 F.2d 1066, 1070 (2d Cir. 1972) ("probable cause is not defeated because an informant is later proved to have lied, as long as the affiant accurately represented what was told him.") Here, as in *Rugendorf,* the allegedly false statements were not those of the affiant, but of a third party who relayed them to the affiant. Accordingly Marson can demonstrate no intentional or reckless falsity.[13]

Second, even should it be found that Flohr's statements were recklessly or intentionally false, the orders authorizing the interceptions will not be set aside unless the affidavits fail to set forth probable cause absent the false statements, *Franks, supra, United States ex rel. Cubicutti v. Vincent,* 383 F.Supp. 662, 667 (S.D.N.Y.1974). Absent Richards' allegations of his dealings with those said to be involved in the scheme, there still remained adequate evidence in both affidavits submitted by the Government to support Judge Lucas' findings of probable cause as has been set forth.

No further hearing on this subject is required.

### Full and Complete Factual Statement

Certain defendants have moved to suppress evidence obtained pursuant to the five wiretap orders on the ground that the Government failed to supply the issuing judges with a "full and complete statement of the facts and circumstances relied upon." in the affidavits submitted in support of the orders. 18 U.S.C. 2518(1)(b).[14] Defendants Pacella and Fusco have raised certain objections with regard to the naming of individuals in the five wiretap orders. Pacella asserts that any interception of conversations participated in by him should be suppressed because he was not named as a subject of Orders # 4 and # 5 although he admits the Government had sufficient probable cause to name him.

■ In affidavits submitted in support of both Orders # 4 and # 5, Pacella is named in the body of the affidavits but is not named as a subject of the electronic surveillance being sought. The Government contends that it did not believe it had the probable cause necessary to name Pacella as a subject of the order under Section 2518(1)(b)(iv) which requires that an affidavit in support of a wiretap order identify "the person, if known, committing the offense and whose communications are to be intercepted."

Although by the terms of the statute the Government need not name an individual as a subject of a wiretap order in the absence of probable cause, even assuming such probable cause existed, Pacella's argument is foreclosed by *United States v. Donovan,* 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977). There, the Court held that the failure to

**13.** This court does not, of course, mean to imply that the Government can insulate one agent's deliberate misstatement in an affidavit merely by relaying it through another agent personally ignorant of its falsity. *See Franks,* 98 S.Ct. at 2681, n. 6. Although Marson's counsel has made a general unsworn assertion that Flohr's affidavits were made in bad faith, Marson fails to allege that Flohr recklessly accepted Roberts' statements as true or was part of a scheme to intentionally present false evidence to Judge Lucas.

**14.** Section 2518(1)(b) provides that each application in support of an order for electronic surveillance shall include the following information:

"(b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (III) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted."

name as the subject of a wiretap order one whom the Government had probable cause to name was a violation of Section 2518(1)(b)(iv) but that such violation did not require suppression of conversations involving that individual under Section 2518(10). In so holding, the Court found that "suppression is required only for a 'failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device' [citing] *United States v. Giordano,* 416 U.S. 505, 527, 94 S.Ct. 1820, [40 L.Ed.2d 341 (1974).]" 429 U.S. 433–34, 97 S.Ct. 671. Although the Court noted that the statutory requirement of Section 2518(1)(b)(iv) was "undoubtedly important" (*id.* at 434, 97 S.Ct. 658), the Court held that "the failure to identify additional persons who are likely to be overheard engaging in incriminating conversations could hardly invalidate an otherwise lawful judicial authorization." *Id.* at 435, 97 S.Ct. at 672.

Accordingly, the failure to name Pacella as a target of Orders # 4 and # 5 is not a ground for suppression of his intercepted conversations. *See United States v. Scafidi,* 564 F.2d 633, 642 (2d Cir. 1977); *United States v. Smith,* 565 F.2d 292, 294 (4th Cir. 1977).[15]

■ Orders # 4 and # 5 both name as a target of the wiretaps one " 'Richie' believed to be Richard Fusco". Taking a position opposite to that taken by Pacella, Fusco contends that interceptions of conversations in which he participated should be suppressed because the Government did not have ·probable cause to believe the "Richie" named in the orders was Richard Fusco. First, it should be noted that, as the Government admits, there was not a sufficient showing of probable cause to name Fusco as the subject of the orders; rather,

the Government named a "Richie" which it *believed* to be Fusco. The question therefore becomes whether the Government had probable cause to name a "Richie" in the orders. An analysis of the affidavits submitted in support of Orders # 4 and # 5 adequately demonstrates such probable cause existed since both the logs and the transcripts of intercepted conversations several times reflect the participation of a "Richie" in pertinent conversations. Even ·were a lack of probable cause shown, however, Fusco's argument is foreclosed by *Donovan, supra.* A failure on the part of the Government to comply with Section 2518(1)(b)(iv) is not a ground for suppression. 429 U.S. at 434, 97 S.Ct. 658.[16]

■ In a similar fashion, Marson asserts that evidence obtained under the five wiretap orders should be suppressed because conversations relating to the alleged bankruptcy fraud at the Theatre were reasonably anticipated prior to March 10, 1977 when Judge Lucas signed Order # 1 but were not included in Agent Flohr's affidavit of that date in violation of Section 2518(1)(b). In support of his position, Marson cites Agent Walker's testimony that prior to Order # 1, the Los Angeles FBI office knew from a review of toll charges that Marson was in telephonic communication with DePalma; that DePalma was reputedly associated with organized crime; that DePalma was involved with the Theatre; that DePalma, Marson and others were photographed at the Theatre; and that a past criminal investigation of the Theatre had been conducted by the FBI. These facts fall short, however, of Marson's contention that prior to March 10, the Government knew that Marson, DePalma and others were engaged in a bankruptcy fraud scheme at the Theatre or that the Government was aware that Marson was using his telephone to discuss these activities. Walk-

---

15. The defendants have not asserted that the failure to comply with Section 2518(1)(b)(iv) was a result of the Government's bad faith, an issue which the *Donovan* Court did not reach (429 U.S. at 436, n.23, 97 S.Ct. 658) and this issue will not be addressed here.

16. For similar, reasons, any failure by the Government to properly identify DePalma in Agent Flohr's affidavit submitted in support of Order # 2 does not warrant suppression.

er has testified that Marson was not specifically known to have been an object of an earlier Theatre investigation nor was the extent of his involvement with the Theatre known. Moreover, prior to the institution of Order # 1, Walker was never instructed to "dig up" evidence on the Theatre or listen for calls that might relate to the Theatre.

The Government is only required to list in its application those crimes which it has probable cause to believe are being committed. Section 2518(1)(b). Marson has presented no evidence beyond supposition to indicate this statutory standard has been breached.[17]

*Minimization.*

◼ The defendants have all moved to suppress evidence obtained by the Government through electronic surveillance, alleging that the evidence was acquired in violation of the "minimization" requirement of 18 U.S.C. § 2518(5). That section provides:

Every order . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . . .

Defendants assert that the manner in which the wiretaps were executed resulted in unnecessary monitoring and recording of privileged or irrelevant conversations in violation of Section 2518(5) and urge that all the intercepted conversations be suppressed under 18 U.S.C. § 2518(10)(a). For the reasons hereinafter stated, this aspect of defendants' motion is denied.

Section 2518(5) was designed to prevent improper invasions of the right of privacy and to curtail the indiscriminate seizure of communications. *United States v. Clerkley,* 556 F.2d 709, 715 (4th Cir. 1977); *United States v. Focarile,* 340 F.Supp. 1033, 1044 (D.Md.1972), *aff'd. sub nom. United States v. Giordano,* 469 F.2d 522 (4th Cir. 1972), *aff'd.,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). Before evidence seized under this section may be admitted, the court must be "left with the conviction that on the whole the agents have shown a high regard for the right of privacy and have done all they reasonably could to avoid unnecessary intrusion." *United States v. Tortorello,* 480 F.2d 764, 784 (2d Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973). The proper standard to apply is thus one of reasonableness. The Government has the initial burden to show compliance with minimization requirements. *United States v. Rizzo,* 491 F.2d 215, 217, n.7 (2d Cir.), *cert. denied,* 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974).

To determine whether the Government has met this burden, reference must be made to *Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), where the Supreme Court for the first time construed the minimization requirement of Section 2518(5). In *Scott,* a court order was issued authorizing the interception of telephone communications over a single telephone of nine individuals who were allegedly participating in a conspiracy to import and distribute narcotics. The court order authorizing the interception required that the wiretap be conducted in such a way as to minimize nonpertinent communications. Pursuant to the order, the Government intercepted all the communications over the phone, although only 40% of the intercepted

---

17. Marson has drawn the court's attention to three conversations intercepted pursuant to Order # 1 on March 11, 1977. It is his contention that, in the light of these conversations, the monitoring agents "would have required prior knowledge of the Westchester Premier Theatre investigation in order to have considered these conversations relevant." An examination of the transcripts of the conversations, however, demonstrates the agents would not have needed prior knowledge of Theatre affairs to have intercepted these conversations. Early in the conversation between Marson and defendant Eliot Weisman, intercepted 8:11 a.m., Marson suggested to Weisman that a "phony" statement be submitted to a bank. Such conduct could entail a violation of 18 U.S.C. § 1014 (prohibiting the submission of a false statement to a bank). In the 11:15 a.m. conversation between Marson and DePalma, reference was made to the earlier conversation with Weisman and that an "attorney wanted a bank statement." The 12:00 noon intercepted conversation was of very short duration (less than one minute) and had nothing to do with the Theatre.

conversations were narcotics related. The Court rejected defendants' argument that the interception of each call constituted a lack of good faith by the monitoring agent and a consequent violation of Section 2518(5). Rather, the Court held that an objective assessment must be made as to whether the actions of the monitoring agents were reasonable under the circumstances:

> Because of the necessarily *ad hoc* nature of any determination of reasonableness, there can be no inflexible rule of law which will decide every case. The statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to "minimize" the interception of such conversations. Whether the agents have in fact conducted the wiretap in such a manner will depend on the facts and circumstances of each case.

*Scott,* 98 S.Ct. at 1724.

The five court-ordered wiretaps in this case authorized electronic surveillance in what the Government alleges were widespread criminal enterprises involving a large number of persons operating in several states. In total, 353 reels of tape recorded over 12,000 intercepted conversations.[18] Of this number, defendants have questioned the interception of less than 400 conversations, although an examination of the logs indicates a much larger number of nonpertinent interceptions. Despite the relatively small number of objections raised by defendants, considering the total number of interceptions, a review of the Government's minimization is required.

In this connection, hearings were conducted before this court on August 8, 9, 10, 28 and 29, 1978. The Government called several FBI agents as witnesses and introduced numerous exhibits into evidence. Defendants were given an opportunity to establish that the Government had not met its burden of establishing a reasonable effort at minimization, as required by *Scott.*

Prior to the commencement of monitoring, Government attorneys gave detailed oral and written instructions regarding minimization to the agents who were to monitor the wiretaps. Before assuming his duties at a monitoring post, each agent was required to read and initial the written instructions, the court order and supporting affidavit, all of which were posted at the monitoring station. The monitoring agents were instructed to make a good faith effort not to intercept nonpertinent or privileged communications, both of which were explained to the agents in some detail.

Instructions regarding the actual monitoring of conversations were specific. With regard to the California wiretaps, the agents were instructed to monitor each conversation for a maximum of three minutes in order to determine whether the conversation was pertinent; if not, monitoring and recording were to be discontinued immediately. For the New York wiretaps, the agents were instructed to determine the pertinence of a call within two minutes.[19] At the ends of these time periods (or earlier if nonpertinence became apparent), interception was to cease; the agents were then to wait three minutes and if the conversation was continuing to reinstate intercep-

18. The Government has represented that approximately 11,400 conversations were intercepted pursuant to the three orders signed by Judge Knapp. No calculation has been made as to the number of conversations intercepted under the two California orders signed by Judge Lucas, but a calculation of over 12,000 interceptions made under all five wiretap orders appears conservative.

19. The use of this two or three minute interval to determine the pertinence of a conversation intercepted during electronic surveillance operations involving an illegal conspiracy with nu-

merous persons whose identity is difficult to ascertain has been judicially approved as meeting the requirements of Section 2518(5). *See United States v. Losing,* 560 F.2d 906, 909, n.1 (8th Cir.), *cert. denied,* 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977). In *United States v. Hinton,* 543 F.2d 1002, 1012 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 489 (1976), the court found that a five minute period utilized by agents to determine the pertinence of intercepted conversations was appropriate where conspirators frequently used code language when discussing illegal activity.

tion for an additional one minute period to determine the pertinence of a call. If the call remained nonpertinent, the agent was instructed to terminate interception.[20] The agents were instructed to keep logs of each monitored conversation and the logs were reviewed daily by supervisory agents to assure that minimization procedures were being followed. Daily oral reports and periodic written memoranda were made to Government attorneys to review the monitoring operation. Based upon information so obtained and obtained by other methods of investigation, the Government attorneys submitted five-day reports to Judge Lucas and Judge Knapp during the extent of each wiretap order. Through an analysis of the logs, the Government attempted to limit the interception of nonpertinent telephone conversations by discontinuing monitoring on telephones not used by subjects of the order.[21]

Agents were instructed not to intercept conversations of a privileged nature. When it became known that certain attorneys were communicating with subjects of the orders, the attorneys' names were posted at monitoring stations and agents were instructed to cease interception of these conversations once identities of the parties were determined. Similar procedures were followed with respect to discovered instances of husband-wife, doctor-patient and priest-penitent privilege.

The defendants argue that despite this procedure, numerous nonpertinent calls were indeed intercepted by the monitoring agents as were several calls of a privileged nature, and that the monitoring agents failed to follow their own guidelines and thus violated the statutory minimization requirements. In particular, defendants assert the monitoring agents intercepted at-

torney-client and doctor-patient conversations, although the agents should have known such communications were privileged. In addition, defendants contend that conversations concerning DePalma's car, girlfriend and grooming were continually intercepted although monitoring agents should have recognized a "pattern of innocence" and accordingly, the nonpertinence of the conversation. Finally, the defendants assert that the large number of nonpertinent interceptions indicate a *per se* failure to properly minimize under the statute.

First, the court notes that the mere number of nonpertinent interceptions does not require a finding that statutory minimization standards have been violated. *See, e. g., Scott, supra* (interception of 60% nonpertinent calls did not indicate a failure to minimize); *United States v. Manfredi,* 488 F.2d 588 (2d Cir. 1973), *cert. denied,* 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974) (no suppression where every telephone call was intercepted and recorded although 50% were nonpertinent). Moreover, the court should approach the issue of the reasonableness of the Government's minimization efforts not with the benefit of hindsight, but rather in light of the circumstances as they existed at the time of the interceptions. *See, e. g., Scott, supra; United States v. Sisca,* 361 F.Supp. 735, 745 (S.D.N.Y.1973), *aff'd on other grounds,* 503 F.2d 1337 (2d Cir.), *cert. denied,* 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974). Accordingly, it has been recognized that "[i]t is virtually impossible to completely exclude all irrelevant matter from intercepted conversations." *United States v. Schwartz,* 535 F.2d 160, 164 (2d Cir. 1976), cert. denied, 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 581 (1977). Where, as here, a wide-

---

**20.** This process is known as "spot-checking." Tr. 108–9. "Because even innocent conversations oftentimes turn to criminal matters, spot-checking of such conversations is permissible especially in a case such as this involving a broad scope of criminal activity and a sophisticated criminal element." *United States v. Daly,* 535 F.2d 434, 441–2 (8th Cir. 1976).

**21.** During the total sixty days of electronic surveillance authorized with the two California orders, thirty-three days were utilized for monitory purposes because of Marson's absence from his home, the site of the wiretap. Under the New York orders interception of conversations over one of the DePalma telephones was terminated before expiration of the order because of the high percentage of nonpertinent calls.

spread criminal conspiracy is thought to exist, "more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise." *Scott,* 98 S.Ct. at 1725.

Nevertheless, the statute requires that unnecessary intrusions into communicants' private conversations be "minimized," *i.e.,* reduced to the smallest possible degree. *United States v. Clerkley, supra,* 556 F.2d at 716. Thus it is important for a proper minimization procedure that the Government recognize "patterns of innocence." Once the interception has commenced, the Government should be able to determine nonpertinent conversations which are irrelevant as indicated by the identity of the parties or the telephone number. *See Scott, supra.*

Application of these standards indicates that, for the most part, proper minimization techniques were utilized by the Government in the circumstances which existed at that time. Several difficult problems faced the Government in its monitoring operations under the five wiretap orders. First, the Government was investigating a complex series of financial transactions in Nevada and New York. At the instigation of the investigation, the agents reported calls from unknown parties whose identities were difficult to ascertain. Moreover, parties to the conversations often spoke in guarded or coded terms and also lapsed at times into foreign language. It was difficult to develop patterns of nonpertinent conversations because of the one-time-only nature of the calls. Finally, it was difficult to identify parties to the conversations when nicknames or less than complete names were used.

Interception of many of the conversations cited by defendants terminated within the two or three minutes guideline issued by the Government attorneys. Other telephone conversations were recognized by the

agents as being nonpertinent as indicated by the logs and monitoring was then discontinued. Still other intercepts appear to have been pertinent, contrary to the defendants' interpretations.

Initial interceptions of conversations concerning DePalma's car, girlfriend and grooming appear justified under the circumstances. Analysis of the agents' logs indicate that for each of the five intercepted conversations with DePalma's barber cited by defendants, the agents recognized the nonpertinence of the call and discontinued monitoring, usually within two minutes. Similarly, the interceptions of conversations with DePalma's mechanic pointed out by defendants were terminated within a two or three minute period, often with the agents noting the nonpertinence of the call in the logs.[22] Telephone conversations between DePalma and his mother were also intercepted, although in two cases the agent noted in his log the nonpertinence of the call within two minutes and monitoring was discontinued, subject to spot-checking. Another call was terminated in less than one minute.

The strongest argument presented by the defendants for the proposition that the Government should have recognized a pattern of innocence is with regard to the interception of DePalma's conversations with his girlfriend. In the majority of these twenty-four telephone conversations between DePalma and his girlfriend, the woman did not disclose her name and was listed on the log as "unknown female". Several calls were very brief (less than one minute) and consisted of a quickly arranged tryst. In almost every case, the agents recognized the nonpertinence of each call and discontinued monitoring within a brief period of time. Nevertheless, the defendants assert that because of the frequency of the calls, many of which were directed to the same number, the agents should have

---

22. The defendants have also pointed our four intercepted conversations between DePalma and Sal, apparently a swimming pool serviceman. The agents' logs indicate that for three of these conversations, monitoring was discontinued once the agent realized the nonperti- nence of the call, all within three minutes of the placing of the call. Although the log for one intercepted conversation does not indicate when monitoring was discontinued, defendants did not assert the intercept lasted beyond the Government two or three minute guideline.

recognized the nonpertinence of the calls as soon as the number was dialed and immediately discontinued monitoring.[23] However, the Government has pointed out to the court that on at least one occasion, a conversation between DePalma and his girlfriend disclosed pertinent information concerning DePalma's alleged contacts with organized crime. In such circumstances, no pattern of innocence could be established with finality and continued monitoring was warranted to determine pertinency.

The Government also intercepted privileged communications between husband-wife, attorney-client and doctor-patient. As with all other interceptions under Title III, the minimization requirement with regard to these types of conversations is violated only if monitoring of such conversations is unreasonable under the circumstances. However, once the parties have been identified and the conversation between them is determined to be nonpertinent or privileged, monitoring of the conversation must cease immediately.[24]

Defendants' principal objections with respect to interception of husband-wife calls center about the monitoring of conversations between Marson and his wife and between DePalma and his wife. With respect to the California orders, defendants note the interception of three telephone conversations between Marson and his wife, which defendants assert violate the minimization provisions of Section 2518(5). Although interception of husband-wife conversations may demonstrate the lack of a reasonable effort on the part of the Government to minimize nonpertinent conversations in many cases, such is not the situation here. Agent Walker, the special agent in charge of the California monitoring operation, testified that early in the monitoring process, the Government had reason to believe that Mrs. Marson might have been a participant in the conspiracy. Although this belief did not ultimately prove out, from an examination of the agents' logs of the intercepted conversations, interception and monitoring of these conversations was not unreasonable in light of the circumstances which existed at that time.

Defendants have also noted fourteen conversations between DePalma and his wife which defendants contend demonstrate the Government's failure to minimize. Of the fourteen calls, four interceptions are noted in the logs as being with an "unknown female", which shows that the monitoring agent failed to identify the caller as DePalma's wife.[25] Seven other conversations were terminated once the identity of DePalma's wife was established, often with a note being made in the log that the conversation was nonpertinent or privileged. In the remaining three calls, however, monitoring was not discontinued once DePalma's wife's identity was known. In these instances the court cannot find the agents took reasonable steps to minimize the interception of these nonpertinent calls. The agents knew the name of DePalma's wife and her identity was disclosed in the course of the moni-

23. The monitoring post was equipped with a device which immediately transformed the electrical impulses generated in dialing an outgoing call into a seven digit telephone number displayed on a screen. Thus the monitoring agent could always determine the telephone number dialed from the phone subject to the intercept.

24. *See United States v. Hyde,* 574 F.2d 856, 870 (5th Cir. 1978), where the court stated:
"The defendants argue that calls between Mr. Hyde and his attorney and physician were monitored, and that these calls should have been privileged—another supposed violation of the minimization requirements. But the agents listened to these calls only long enough to determine that the doctor and lawyer were not participating in the conspiracy; no further intrusion was made. Indeed, several calls to the attorney were not monitored at all. It would be unreasonable to expect agents to ignore completely any call to an attorney or doctor; doctors and lawyers have been known to commit crimes. The agents' conduct was entirely correct."

25. These conversations all took place at the early stages of the first New York wiretap order and apparently reflected the agents' difficulties in identifying the female voice involved. The logs do not indicate that the unknown female was identified by name.

tored conversations. The court finds monitoring in such circumstances unreasonable.[26]

Five conversations between Marson and his attorney were intercepted.[27] Although in ordinary circumstances knowing interception of an attorney-client communication would be an unreasonable interception under the minimization requirement of Section 2518(5), here the Government asserted that at the time of the interception there was reason to believe that the attorney may have been a participant in the illegal activities alleged in Orders # 1 and # 2.[28] Indeed, an examination of the agents' log support this view. On at least two occasions, the attorney was connected with another subject of the California investigation who, according to the Government, was attempting to establish a contract for services through the use of improper methods. The attorney was also contacted by Marson to assist in establishing a California corporation, which the Government contended also involved the use of illegal payments. Although the Government later decided that the attorney was not involved in any criminal conduct and monitoring agents were instructed not to intercept conversations between Marson and his attorney, in light of the circumstances at the time these interceptions occurred this court does not find such interceptions to have been unreasonable or in violation of Section 2518(5).

In contrast, the Government's interceptions of conversations between DePalma and his attorney were unreasonable. As early as May 12, 1977, monitoring agents were informed through an intercepted conversation that Robert Ellis represented DePalma and defendants have noted four instances in which the Government intercepted conversations between DePalma and Ellis. The Government has at no time alleged that Ellis was in any way involved with the criminal activity here under investigation. The court finds these interceptions improper under the circumstances. Once Ellis' identity and his relationship with DePalma were known, the agents should have complied with instructions of the United States Attorney and ceased such interceptions. Particularly egregious is the interception on May 27, 1977 of a conversation between DePalma and Ellis in which Ellis explains in some detail the progress of a New Jersey proceeding against DePalma. That none of the intercepted privileged calls dealt with any of the matters concerning the Indictment here in no way alters the impropriety of the interception.

Finally, defendants have brought to the court's attention four intercepted conversations between doctor and patient. The interception of two conversations between DePalma and his doctor on May 26, 1977 was, under the circumstances, an unreasonable intrusion into privileged communications. Although the agents apparently knew these conversations were with a doctor, monitoring was not discontinued; such activity violated Section 2518(5). Two conversations intercepted on May 27, however, are not violative of the statute. In both instances, monitoring was discontinued as soon as the unknown male in the conversation was identified as a doctor.

---

**26.** The Government has attempted to argue that because Mrs. DePalma may be named as an unindicted co-conspirator in the Government's bill of particulars, interception of all conversations between DePalma and his wife was proper. Here, however, the Government is acting with the benefit of hindsight. Unlike the situation which existed with regard to Mrs. Marson, the Government has offered no evidence to establish that at the time of the intercepts, monitoring agents believed Mrs. DePalma was involved in the alleged criminal activities. Indeed, the Government's position is belied by the distribution of a memorandum dated June 23, 1977 to all monitoring agents from the Assistant United States Attorney in charge of the New York investigation which orders that "[a]ll conversations between DePalma and his wife should be immediately discontinued once they have been identified."

**27.** Although the defendants claimed seven such conversations existed, only five could be located in the agents' logs.

**28.** Of course, a communication between a client and his attorney is not privileged when the communication is made in furtherance of a crime or fraud. See generally, 8 Wright & Miller, Federal Practice and Procedure: Civil § 2017 at 134 (1970).

In the face of these unreasonable interceptions, the issue which remains is the sanction to be imposed. The defendants have requested this court to suppress all communications intercepted as a result of the five wiretap orders as a prophylactic deterrent to future unreasonable interceptions by the Government. Such a remedy would be drastic and excessive, given the number of interceptions, the number of demonstrated violations and the nature of human error. Although this court views the transgressions committed by the Government as serious, the unreasonable interception of three conversations between DePalma and his wife, four conversations between DePalma and his attorney and two conversations between DePalma and his doctor do not require the suppression of all interceptions under the five wiretap orders. Taken as a whole, this court is left with the conviction that proper minimization standards were observed by the Government in the circumstances of this case.[29]

*The Failure to Record.*

Defendants make an additional attack upon the five wiretaps on the ground that the monitoring agents failed to record all the conversations intercepted in violation of Section 2518(8)(a).[30] In support of their position, defendants have submitted a list of twenty-two conversations which defendants contend were monitored but not recorded, either in full or part. Of these twenty-two conversations, however, only twelve calls involved a failure to monitor all or part of an intercepted communication; the remainder either involved busy signals or could not be located in the agents' logs.

Testimony submitted to this court on August 29, 1978 described the monitoring and recording operation utilized in some detail. Connected directly to the telephone line which was the subject of the New York wiretap order was a reel-to-reel tape recorder mounted in the agents' monitoring post. Also connected to the subject telephone line was a pen register type device (the "MITEL") which provided a visual display of outgoing telephone numbers. The tape recorder was equipped with a meter which indicated the existence and volume of activity on the line. Earphones through which the agents could listen to any conversation which was being recorded were also connected to the recorder.

The recorder was activated manually by operation of a remote "on/off" switch which the agent operated at his desk area several feet from the machine. This switch would be activated by the agent once an incoming or outgoing call was made, either of which would create a noise from the MITEL device and be reflected by activity on the tape recorder meter.

Of the remaining twelve conversations, none contradict the sworn testimony presented to this court that it was impossible to listen to conversations on the intercepted telephones without having the recorder in operation. Eight of these twelve calls were apparently only recorded in part either through malfunction of the recording equipment or human error in an agent's failure to operate the remote control switch. The logs or transcripts for each of these calls indicate that during this recording interruption no monitoring took place. The sole support for defendants' contention is found in ambiguous references in the

29. The defendants have also submitted to this court a cassette recording of thirty-eight conversations intercepted under the three New York wiretap orders which defendants allege indicate "the tone, tenure and flavor of lack of minimization." In fact, these taped conversations underscore the Government's compliance with, rather than violation of, statutory minimization requirements. Only six of the thirty-eight conversations were intercepted for a period of more than three minutes and, under the circumstances which existed at the time, this court cannot find these interceptions to be unreasonable. Nothing has been presented in this cassette recording which alters this court's determination that appropriate minimization standards were observed by the Government.

30. 18 U.S.C. § 2518(8)(a) provides in relevant part: "The contents of any wire or oral communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device."

agents' logs indicating for four conversations that while the call had not been recorded, the agents were aware of the substance of the conversations which took place. These scattered ambiguous references do not, in this court's view, rise to a level sufficient to contradict sworn testimony.

Even assuming that out of over eleven thousand intercepts, the four conversations were monitored but not recorded by a means unexplained in the testimony, this court cannot find that such instances were more than *de minimis* transgressions of the statutes which would not result in suppression. *See United States v. Daly,* 535 F.2d 434, 442 (8th Cir. 1976) (monitoring but not recording less than ten percent of the conversations involved did not rise to statutory violation.) *Compare United States v. Clerkley,* 556 F.2d 709, 718 (4th Cir. 1977) (failure to record eighty percent of total monitored conversations may have resulted in violation of Section 2518(8)(a), but such violation did not require suppression under *United States v. Donovan, supra,* 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652). Further, defendants have made no showing of prejudice by this alleged failure to record or that any incriminating conversations were recorded out of context. *Daly, supra.*

This court can hardly insist that the Government conduct error-free surveillance at the risk of exclusion or suppression. It can, however, insist that the congressional concern, namely that adequate records of intercepted conversations be available, is complied with. *See* 1968 U.S.Code Cong. & Ad.News, pp. 2112, 2193. Such can easily be found here, in the light of both the extensive records of monitored conversations and the spontaneity of failures to record. Given such *de minimis* deviation, this court finds no violation of § 2518(8)(a) and rules suppression inappropriate.[31]

## The Failure to Amend.

During the operation of the judicially authorized wiretaps, the Government intercepted information relating to offenses other than those specified in the order of authorization. Defendants now move to suppress evidence derived from all interceptions on the ground that the Government failed to amend the orders, once the evidence of these other offenses surfaced. Defendants' claim is that the Government's failure to obtain amendment of the orders violated 18 U.S.C. § 2517(5). In particular, Pacella has moved to suppress all his intercepted conversations on the ground that once his identity and alleged role in the criminal activity had become known to the Government, Orders # 4 and # 5 should have been amended to name him as a subject. Similarly, Marson moves to suppress all interceptions pursuant to Orders # 1 and # 2 on the ground that the Government should have amended these orders to specify his alleged criminal involvement with the Theatre as soon as this information was discovered by Government agents. Pacella also asserts that the Government

31. For a short period during the execution, of Order # 3, the Government employed a device which would automatically record conversations without any manual operation by the agents. The use of this device was discontinued because of mechanical difficulties. During the hearings, Agent Melonas testified that to his knowledge, no automatic recording device was used during the New York monitoring operation. Defendants have cited log entries for May 8 and May 10, 1977—a period during which this automatic recording device was utilized—which indicated that Agent Melonas used this machine. Although these log references appear to contradict Melonas' testimony on this point, the court does not find Melonas' over-all credibility impeached. Moreover, despite the existence of this automatic recording device, defendants have questioned only five log entries—none involving the automatic recording device—which defendants contend indicate the Government recorded intercepted conversations without monitoring in violation of Title III's minimization standards. In each instance cited by the defendants, the log indicates that the monitoring agent determined the conversation to be nonpertinent and discontinued monitoring but the recorder was left running, apparently due to human error. Neither these isolated instances nor the discrepancy in Agent Melonas' testimony compel this court to alter its conclusion that in a monitoring operation involving over 12,000 intercepted conversations, proper monitoring standards were observed by the Government.

should have applied to Judge Lucas for an amendment before using interceptions relating to the Theatre from Orders # 1 and # 2 as evidence of probable cause to obtain Order # 3 from Judge Knapp.

■ Section 2517(5) permits the use of information relating to "other offenses" in certain circumstances.[32] Under Sections 2517(1) and (2), such information may be disclosed by one law enforcement officer to another, and may be used by a law enforcement officer, without prior judicial approval, when such disclosure and use is "appropriate to the proper performance of the [officer's] official duties." Establishment of probable cause to search or to develop witnesses is indeed an appropriate use. *See* 1968 U.S.Code Cong. & Ad.News, pp. 2112, 2188. Accordingly, the Government does not need to obtain judicial approval before using information relating to "other offenses" to support an application for additional orders authorizing wiretaps. *United States v. Johnson,* 176 U.S.App.D.C. 179, 539 F.2d 181, 187 (1976), *cert. denied,* 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977); *United States v. Vento,* 533 F.2d 838, 855 (3d Cir. 1976). To the extent defendant Pacella's motion alleges that the Government violated Section 2517(5) by not obtaining judicial approval to use the information relating to "other offenses" in support of its application for additional orders of wiretap authorization, it is denied.

Additionally, Section 2517(5) permits the use of information relating to other offenses in a "proceeding" pursuant to Section 2517(3), so long as judicial authorization or approval is obtained. Application for such judicial authorization or approval "shall be made as soon as practicable." 18 U.S.C. § 2517(5).

On January 27, 1978, the Government obtained an order from Judge Knapp under Section 2517 authorizing the use in any criminal proceeding of information inter-cepted under Orders # 1 and # 2 relating to several offenses not included in the original orders which involved the Theatre. On February 6, 1978, a similar order from Judge Knapp was obtained which authorized the use in any proceeding of information intercepted under Orders # 3, # 4 and # 5 which related to several offenses not included in the original orders involving, among others, defendant Pacella. Both these amended orders were obtained prior to submission of this evidence to the Grand Jury which eventually presented the indictment in this case. Pacella and Marson assert the amendments should have been obtained sooner than six months after the end of interceptions under Order # 5, and that the delay violates the requirement to do so as soon "as soon as practicable".

■ Defendants' contentions are supported neither by the language of Section 2517 nor by the relevant case law. The statute does not contemplate the immediate amendment of orders of authorization as soon as any information relating to other offenses is intercepted. To so maintain is to ignore the existence of Section 2517(1) and (2) which explicitly allow the use of such information without an amendment to the order of authorization. *See, e. g., Johnson, supra; Vento, supra.* The use of such information pursuant to Section 2517(3), which does require judicial approval, has been disallowed when the required judicial approval was not obtained prior to disclosure of the information in a grand jury proceeding. *United States v. Marion,* 535 F.2d 697 (2d Cir. 1976). However, the facts in *Marion* are not those before this court. Here, the Government has obtained the required judicial approval before using the information in any proceeding.

In *Vento, supra,* the court denied defendants' motion to suppress although five months had elapsed between the last interception and the date of the disclosure order and the disclosure order was obtained sub-

---

32. This use of information of evidence unrelated to the subject matter of the original wiretap order has its constitutional underpinnings in the "plain view" doctrine. Under this doctrine, the Government may seize some other article of incriminating character where incident to an otherwise lawful search and where the unrelated evidence was discovered inadvertently. *Coolidge v. New Hampshire,* 403 U.S. 443, 464–466, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

826

sequent to the entry of the original indictment in the case. The court held that, when the disclosure order was obtained prior to the presentation of the evidence of other offenses to the grand jury and more than two and one-half months before the trial was to begin, defendants had failed to demonstrate that the disclosure order was not secured "as soon as practicable" for the purposes of Section 2517(5). *Vento*, 533 F.2d at 855.

Defendants have not shown that they were prejudiced by the Government's delay in securing judicial approval to use the information relating to other offenses in a proceeding within the meaning of Section 2517(3). The Government did secure such approval before using the information in any such proceeding. In these circumstances, there has been no showing that the required approval was not obtained "as soon as practicable". Defendants' motions are therefore denied.[33]

*Security of the Tapes.*

■ Defendants have also moved to suppress the tape recordings of all conversations intercepted under the three New York orders, alleging that the lack of security surrounding the making and storage of the tapes was in violation of Section 2518(8)(a).[34]

It has already been determined by this court that the Government failed to seal properly one reel of tape recorded conversations intercepted pursuant to Order # 4 and two reels of tape recorded conversations intercepted pursuant to Order # 5. By order dated July 28, 1978, those tapes were suppressed by this court without objection by the Government. That same order directed the Government to produce evidence at a hearing concerning the circumstances relating to the failure to seal those suppressed tapes and how that failure related to the protection and security of all tapes. At that hearing, the Government produced both testimonial and documentary evidence which the defendants were allowed to rebut through cross-examination and presentation of their own evidence. As a result of that hearing, this court finds that the Government took proper steps to ensure the security of the tapes pending sealing by the court. Therefore, this aspect of defendants' motion is denied.

■ A primary purpose of Section 2518(8)(a) is to ensure that "[a]ppropriate procedures [are] developed to safeguard the identity, physical integrity, and contents of the recordings to assure their admissibility in evidence." 1968 U.S.Code Cong. & Ad. News pp. 2112, 2193. *See United States v. DiMuro*, 540 F.2d 503, 512 n.15 (1st Cir.), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 733, 50

**33.** The reliance of defendants Marson and Pacella on *United States v. Capra*, 501 F.2d 267 (2d Cir. 1974) is misplaced. In *Capra*, the police intercepted the conversations of one DellaCava, although the judicially approved target of their electronic eavesdropping was named DellaValle. DellaCava was involved in criminal activity, unrelated to DellaValle's activity which was subject to authorized scrutiny. In granting DellaCava's motion to suppress the evidence so gathered against him, the court acknowledged that, under New York law, a retroactive amendment could be made validly "to substitute specifically identified persons for 'John Does' and to add new crimes to those previously listed on the warrant." 501 F.2d at 276, n. 7. The court reasoned, however, that DellaCava's conversations could not have been intercepted under the original authorization, and that the knowing interception of DellaCava's calls was never within the discretion of the monitoring officers. The facts asserted by Pacella and Marson are inapposite to *Capra*.

Here, Marson was named as a subject of the orders, and Pacella, although not so named, was specifically identified in papers supporting the Government's application. Moreover, defendant Marson's involvement with the Theatre was an example of alleged additional criminal activity by a party validly subject to a judicially approved wiretap order, and not the type of unrelated criminal activity described in *Capra*.

**34.** 18 U.S.C. § 2518(8)(a) provides, in relevant part:

"The recording of the contents of any wire or oral communication under this subsection shall be done in such a way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions."

L.Ed.2d 749 (1976). Accordingly, the Government should take sufficient steps to preserve the accuracy of recordings at the time they are made and deter alteration of those recordings pending a judicial order sealing the tapes. In most circumstances, these procedures should include restricted access to the monitoring area, records indicating who held custody of the tapes at all times, and storage of the tapes under lock and key pending a judicial order sealing them. Testimony presented at the hearing indicates that the Government dutifully observed these security measures.

The New York wiretaps were operated through a monitoring station that was manned twenty-four hours a day by special agents of the FBI who were the only individuals allowed into the station. Special Agent Fisk, the agent who supervised the New York monitoring operation, and Special Agent Tolan, the agent in charge of the monitoring plant, were the only persons with keys to the room.[35]

At the monitoring station, each telephone number for which interception was authorized was monitored by one agent except on rare occasions of personal privilege and recorded singly on one machine. At the beginning of each twenty-four hour working period, a new reel of tape was placed on the recording machine. The reel of tape and the tape box were labeled with the number given to each electronic surveillance (an "SDNY number"), the telephone number intercepted, the reel number, the date and the monitoring agent's initials. Both the tape and the tape box were marked "original". The agent placing the reel on the recorder also filled out a chain of custody form which remained with the original tape in the original tape box. This form contained the identifying number, the name of

the agent in charge of the investigation, date of the intercept, a file number, reel number, time of recorded conversations, monitoring agent, telephone number intercepted and the name of the agent in charge of the monitoring plant. The form also indicated to whom the original tape was transferred and the date of transferral. When a tape was used up during the course of the day, it would be removed and placed in its box, and a new tape, denoted "reel No. 2", was placed on the machine. In such an instance, the required chain of custody form for the new tape would be completed, as well as the necessary information on the tape and tape box as outlined above. At the end of the twenty-four hour period (or earlier if the tape had been used up), the reel was taken off the machine and placed in its box to remain in the custody of the agent in charge of the plant at that time, usually the midnight to 8 a. m. shift. The agent on this shift placed a new reel of tape on the machine, following the procedures described above, and duplicated all original tapes.[36] Once duplicated, the original was returned to its box, together with its chain of custody form, and both the duplicate and originals were placed in separate envelopes to be picked up the next morning by an agent for transfer to the local FBI office. This transfer was noted on the chain of custody form.

At the local office, the tapes were brought to Agent Fisk, who then reviewed the chain of custody forms for each tape, indicated on the form that he had received the tape, and placed the tapes, duplicates, and chain of custody forms in a locked cabinet.[37] Only Fisk and Tolan had keys to the cabinet which remained locked at all times. These tapes remained locked in the

---

35. Although it was conceded on cross examination that hotel personnel may have had keys to the monitoring plant, there was no testimony that anyone other than FBI agents were present in the room.

36. Pursuant to Section 2518(8)(a), duplicate copies may be made for use or disclosure pursuant to Section 2517(1) and (2).

37. In a few instances, the tapes were not returned directly to Fisk's custody but rather were placed in the locked cabinet by Tolan. Fisk's name was nevertheless placed on the chain of custody form, indicating, according to Fisk, that the tapes had been returned to his control. This primarily occurred when Fisk was excused from his duties because of personal matters during a period near the end of the wiretaps.

cabinet until removed for sealing, the original followed by the duplicate. A limited exception to this procedure occurred when duplicates of tapes made at the monitoring station proved defective. The original would then be removed from the locked cabinet by Fisk or Tolan, duplicated, and returned to the cabinet, each change of possession being noted on the chain of custody form.

During cross-examination, defendants pointed out variations in this standard procedure. Although tapes removed from the recording machines at midnight were normally picked up the following morning for transfer to Fisk, in several instances such transfer did not take place for three days following removal from the machine. Usually, this delay was explained by an intervening weekend, during which time the tape usually remained at the monitoring station. The sole exception to this procedure appears to be a tape picked up on Saturday, May 14, 1977 by Agent Tolan that was not transferred to Fisk until Monday, May 16, 1977. Although defendants were given an opportunity to cross-examine Tolan on this point, none did so.

On June 3, 1977, 221 reels of tape recorded conversations intercepted pursuant to Order # 3 and marked as originals were removed from the locked cabinet by Fisk and given to another agent for transfer to Judge Knapp in order to be sealed. These sealed tapes were than returned to the New Rochelle office and locked in a "bulky-exhibits" room by Fisk.[38] On July 20, 1977, twenty-seven reels of tape recorded conversations intercepted pursuant to Order # 4 and marked as originals were removed from the locked cabinet by Fisk and transferred to Judge Knapp for sealing. Again the sealed tapes were returned to Fisk's custody for safekeeping. Because of Fisk's unavailability on July 27, 1977 as a result of a death in his family, Agent Tolan removed forty-four reels of tape recorded conversa-

tions intercepted pursuant to Order # 5 and marked them as originals for transfer to Judge Knapp for sealing. These tapes were returned to Tolan for safekeeping, who placed them in a locked cabinet and they were later put in the "bulky-exhibit" room upon Fisk's return. Each transfer of the tapes to the court for sealing and return was noted on a separate chain of custody form.

On August 16, 1977, three tapes marked as originals (one from Order # 4 and two from Order # 5) were discovered in the locked file cabinet in which only the duplicate tapes were then stored, all other originals having been placed in the "bulky-exhibit" room. These tapes had not been sealed at the time of the others from Orders # 4 and # 5, and were sealed by Judge Owen the following day, August 17, 1977. Upon the motion of defendants, these three tapes were suppressed by this court as violative of Section 2518(5). The explanation offered by the Government was that these three tapes marked as originals were overlooked by agents in their rush to separate tapes marked as originals from those marked as duplicates in order to transport the former to the court for sealing on July 20 and July 27.

The record establishes to this court's satisfaction a detailed method of securing the authenticity and safety of the original tapes. The Government took all necessary steps to ensure that the tapes were accorded limited access by FBI personnel and the defendants have failed to produce any evidence that, except for the actual transfer of the tapes, these originals were not constantly kept under lock and key. Although three tapes were not timely sealed and have been suppressed, there is no suggestion in the record that a failure to seal these tapes resulted from anything other than simple oversight. Defendants have been unable to establish any breach which would compro-

---

**38.** With Judge Knapp's permission, eight tapes intercepted under Order # 3 were not presented for sealing until Monday, May 6, 1977 in order that these tapes could be duplicated. Judge Knapp specifically found that this proce-

dure of sealing the tapes on May 6 for the purpose of duplicating them over the weekend was reasonable and defendants have not challenged his ruling.

mise the security of the remaining tapes. This court finds the Government took sufficient steps to protect the tapes from editing or other alterations as required by Section 2518(8)(a) and accordingly, this aspect of defendants' motion to suppress is denied.

*Pen Register.*

■ Pacella has moved to suppress all evidence which the Government received as a result of employing a pen register in connection with the five wiretap orders. A pen register is a device used to ascertain the telephone numbers of outgoing calls made from a subject telephone. With regard to the three New York wiretaps, a pen register type device was utilized which, through deciphering electrical impulses created in the dialing process, provided a visual display of all outgoing telephone numbers. Pacella contends, without citing any authority, that because there was no separate court order authorizing installation of a pen register in this case all information obtained from the pen register should be suppressed. In fact, the rule appears to the contrary. Where a pen register is employed in connection with court authorized electronic surveillance under Title III, no separate order for the utilization of a pen register is required. *United States v. Cox,* 567 F.2d 930, 933 (10th Cir. 1977), *cert. denied,* 435 U.S. 1018, 98 S.Ct. 1892, 56 L.Ed.2d 398; *United States v. Falcone,* 505 F.2d 478, 482 (3d Cir. 1974), *cert. denied,* 420 U.S. 955, 95 S.Ct. 1338, 43 L.Ed.2d 432 (1975); *United States v. Iannelli,* 430 F.Supp. 151, 156 (W.D.Pa.1977).[39] Accordingly, Pacella's motion is denied.

*The Need for Further Hearings.*

At the conclusion of the hearing on minimization, defendant Marson renewed his request that Agent Baron of the Los Angeles FBI office be produced by the Government in order to allow Marson's counsel to inquire into the possible existence of contact between the New York and Los Angeles FBI offices concerning the New York office's investigation of the Theatre. Marson argues that Agent Baron will testify that prior to the submission of Order # 1 for approval by Judge Lucas the New York office conveyed to Los Angeles information indicating that Marson was involved in illegal activities at the Theatre and this should have been included in Order # 1 as one of its subjects.

As stated earlier in this opinion, no evidence was presented to establish that at the time of application for Order # 1, the Los Angeles office had any information connecting Marson with illegal activities at the Theatre. Marson attempts to refute this conclusion by speculating that a confidential source named in Order # 4 may have informed the Los Angeles office of Marson's involvement with the Theatre in March, 1977, but the court does not view this speculation, unsupported by any facts, as sufficient to overcome its original finding and to require a further factual hearing. Moreover, in an opinion dated August 25, 1978, this court refused Marson's identical request that Baron be produced, and Marson's new speculation is not sufficient to overturn that holding. Accordingly, Marson's request that Agent Baron be produced is denied.

Other defendants have requested that this court require the Government to produce Agent Richard Gentilcore in order to determine whether a so-called "automatic activator" referred to in Gentilcore's log of July 9, 1977 was utilized to automatically record incoming and outgoing telephone calls without being manually turned on by one of the monitoring agents. An affidavit of Agent Tolan, dated September 7, 1978 and submitted to this court after the close of the minimization hearings, indicated that from the period from May 6 to May 10,

---

**39.** The Supreme Court has recently held that an application for the use of a pen register alone as an investigative tool is not subject to the restrictions of Title III but rather must be based upon a showing of probable cause consistent with the requisites of the Fourth Amendment. *United States v. New York Telephone Company,* 434 U.S. 159, 98 S.Ct. 364, 370, 54 L.Ed.2d 376 (1977). Such requirements would not apply here, however, where the pen register was used only in connection with the wiretaps authorized by Judge Knapp.

1977, an electronic instrument was used to automatically record incoming or outgoing calls, activated by electrical impulses on the telephone line. Because of technical malfunctions, its use was discontinued after May 10. Agent Gentilcore's affidavit, also dated September 7, 1978, states that the reference in his log to an "automatic activator" refers to his use of a remote "on/off" switch used to activate the recorder through pressing a button by the agent. Because these affidavits dispose of the factual issue presented by the defendants, no further hearings on the subject of minimization are required. *See United States v. Cirillo,* 499 F.2d 872, 880–81 (2d Cir.), *cert. denied,* 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974).

Finally, defendants' request that hearings be continued with respect to the Government's minimization efforts under the California wiretaps is denied. Defendants have pointed to no evidence in five days of hearings which would require this court to alter its conclusion that proper minimization standards were observed under the California wiretap orders.

## II. *Weisman's Motions*

### Use of Immunized Testimony.

■ On November 17, 1975 defendant Weisman testified before a New York State grand jury, allegedly about matters concerning the Theatre. Subsequently Weisman testified before the Honorable Harold Schwartzberg, United States Bankruptcy Judge, in the *Matter of the Westchester Premier Theatre, Inc.* (Docket No. 76 B 2926), a proceeding under Chapter XI of the Bankruptcy Act. This court held an evidentiary hearing to determine whether the grand jury proceedings which resulted in the present Indictment were tainted by the use of immunized testimony. After a review of all the evidence, including that submitted by the prosecution for in camera review,[40] it is the opinion of this court that there was no use of Weisman's testimony by the Government in obtaining the Indictment.

First, as to the New York State grand jury proceeding, Weisman signed a waiver of immunity form. Weisman having testified without any immunity, the Government would be free to use Weisman's testimony and therefore there is no taint.

As to Weisman's testimony in the bankruptcy proceeding, Weisman testified as an officer of the bankrupt corporation, not as the debtor in possession. According to the sworn testimony of Judge Schwartzberg, Weisman was not testifying under any grant of immunity; he was not designated by the court to perform the duties imposed upon the bankrupt. *See United States v. Castellano,* 349 F.2d 264, 273 (2d Cir. 1965), *cert. denied,* 383 U.S. 928, 86 S.Ct. 934, 15 L.Ed.2d 847 (1966); *United States v. Coyne,* 425 F.Supp. 171 (W.D.N.Y.1977). Therefore, there could be no taint resulting from Weisman's testimony in the bankruptcy proceeding.

Furthermore, the Government has satisfied this court that there was no use of Weisman's testimony in the bankruptcy proceeding in the investigation which led to the present Indictment. At the evidentiary hearing before this court the testimony of the Assistant United States Attorney in charge of this case negated any taint as to the Government's use of Weisman's testimony and stated affirmatively the sources of the evidence presented to the grand jury, namely, wiretaps, informants' evidence and the statements of certain of the co-conspirators. A review of the *in camera* information submitted to this court has established that the Government obtained the Indictment from legitimate sources independent of any of the Weisman testimony before the Bankruptcy Court, whether or not it was immunized. Therefore, the Government has satisfied its affirmative burden. *See United States v. Nemes,* 555 F.2d 51 (2d Cir. 1977). The Indictment will not be suppressed.

40. This *in camera* review included the material relating to the 1975–1976 investigation, and 1977 bankruptcy files of the FBI.

*Weisman's Motion to Suppress.*

Defendant Weisman has moved to suppress certain statements made subsequent to his arrest on September 16, 1977 on a warrant charging him with violating Title 18, United States Code, Section 1014, relating to bank fraud, a charge unrelated to the present Indictment. The complaint upon which the warrant was issued alleges that on or about February 6, 1976, Weisman and his wife knowingly made false statements in an application to obtain a bank loan to purchase certain property. Weisman asserts that the complaint was issued without probable cause and that the interrogation subsequent to his arrest (i) was therefore an unreasonable search and seizure, in violation of his Fourth Amendment rights, (ii) was under circumstances rendering the statements involuntary, abrogating his Fifth Amendment rights and (iii) was without the presence of counsel, abridging his Sixth Amendment rights.

The warrants for the arrest of Weisman and his wife were issued on September 13, 1977 after a finding of probable cause by a Magistrate of this court. Weisman was thereafter kept under surveillance, and it was decided not to make the arrest while he was in the company of others. At approximately 3:00 p. m. on Friday, September 16, 1977, Weisman was alone in his car and was arrested. He was advised of the charge against him and was given his full *Miranda* warnings en route to FBI headquarters.

Upon arrival at FBI headquarters, he was shown an advice of rights form after being photographed and fingerprinted. During processing Weisman asked when he could place a call to his attorney and was told he could do so after the processing was completed. After processing he signed a Waiver of Rights form.[41] No call was placed to his attorney,[42] and he was not arraigned.

Weisman was then taken to an office in local FBI headquarters. At approximately 5:00 p. m. the Assistant United States Attorney arrived, again advised Weisman of his constitutional rights and informed him of the charges against him and his wife, including the possible racketeering charge against him and potential 20 year jail term thereunder.[43] Weisman was informed that although the Government could not make any promises, if he cooperated it would become known to the judge.[44]

Thereafter, Weisman was questioned, sometimes with as many as four people in the room. During the interrogation Weisman called his wife and asked her to meet him at FBI headquarters. Mrs. Weisman

---

**41.** The form states as follows:
   WAIVER OF RIGHTS
   I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

**42.** The Government treated this not as a request, but simply as an inquiry as to when he could call should he desire to do so. Upon completion of processing the Government should have informed Weisman that he was free to call his attorney.

**43.** Assistant United States Attorney Akerman testified as follows:
   Q  Mr. Akerman, have you given some instructions to Agent Fisk on September 16th to have him hold Mr. Weisman for your arrival?
   A  No, I didn't instruct him to hold him for my arrival.

   Q  Did you tell him you wanted him to wait until you had the opportunity to question Mr. Weisman?
   A  No, because I was planning to be there at the same time that Mr. Weisman was brought there.
   Q  Did you tell Mr. Fisk to have Mr. Weisman brought forthwith for arraignment?
   A  No, I did not.
   Q  You wanted to question him that night, did you not?
   A  That's correct. Tr. 752, line 21–753, line 11.

**44.** Agent Fisk testified as follows:
   Q  What was said next, Agent Fisk?
   A  I don't recall exactly what was said next, but you asked for Mr. Weisman's cooperation in the cases.
   Q  What else did I tell him about his cooperation?
   A  You told him you couldn't make any promises to him and that his cooperation, if he did cooperate, would become known to a judge. Tr. 600, lines 2–10.

arrived at approximately 6:45 p. m., at which time she was advised by the Assistant United States Attorney of the warrant for her arrest and of her constitutional rights. Mrs. Weisman spoke to Weisman for a few minutes and placed a call to defendant DePalma; then Weisman requested that she leave the room. Mrs. Weisman remained in a waiting room while the questioning of Weisman continued until approximately 10:45 p. m. Weisman, due to his cooperation, was then permitted to return home with his wife.

The next day, a Saturday, Weisman was arraigned by the Honorable Whitman Knapp at his apartment. Weisman had expressed a fear that if he were arraigned publicly and not later prosecuted on that charge, certain others would suspect he was cooperating with the Government. At arraignment Judge Knapp informed Weisman of the complaint against him and of his constitutional rights. Weisman was then released on his own recognizance. Because Weisman feared for his physical safety, the complaint was sealed.

On Monday, September 19, 1977, Weisman met with the Assistant United States Attorney and two FBI agents at a motel in Connecticut which Weisman had chosen to assure secrecy. Prior to any conversation Weisman was again advised of his constitutional rights, and he signed another Waiver of Rights form. Weisman then answered questions put to him by the Government agents.

The face of the complaint indicates that it was dismissed by the Government on October 2, 1977, although this date, a Sunday, appears to be erroneous. On October 4, 1977, Weisman again met with Government agents. After being advised of his constitutional rights Weisman refused to sign a Waiver of Rights form or to cooperate with the Government. He was subsequently indicted on the charges in the case sub judice.

The complaint charging bank fraud, signed by FBI agent Brendan M. Fisk ("Fisk"), alleged, in pertinent part, as follows:

2) On or about February 6, *1976,* an application for a home mortgage loan was submitted to the Union Savings Bank of New York, 101 Mamaroneck Avenue, Mamaroneck, New York, by the defendants ELIOT H. WEISMAN and MAXINE L. WEISMAN who are husband and wife. The loan application was signed by both defendants.

3) The loan application referred to in paragraph 2 states that the defendant ELIOT H. WEISMAN is the President of the Westchester Premier Theatre and that his annual income *is* $50,000 and that the defendant MAXINE L. WEISMAN *is* employed by the Westchester Premier Theatre, 555 White Plains Road, Tarrytown, New York and that her annual income *is* $2,000. These statements were knowingly false.

4) The payroll records of the Westchester Premier Theatre show that the defendant ELIOT H. WEISMAN earned $36,143 in *1975* from the Westchester Premier Theatre, 555 White Plains Road, Tarrytown, New York, and that the defendant MAXINE L. WEISMAN *was* not on the payroll of the Westchester Premier Theatre in *1975.* (Emphasis added).

The complaint in paragraph 3 contains the allegation that the statements in the loan application were knowingly false, a handwritten allegation added by the Assistant United States Attorney just prior to taking the complaint to the Magistrate. The complaint contains no facts to establish that at the time the loan application was filled out in February 1976 Weisman was not earning the amount set forth in the application.

In *Jaben v. United States,* 381 U.S. 214, 85 S.Ct. 1365, 14 L.Ed.2d 345 (1964) the complaint, which was determined to set forth probable cause, alleged that the agent personally conducted an investigation in the course of which he examined defendants' tax returns, interviewed third persons and consulted public and private records as to the defendants' income. Although the complaint here, signed by Agent Fisk, states that the basis of his knowledge was "an

investigation conducted in the regular course of duties" there is no allegation that he personally conducted the investigation. Fisk testified that he first learned about the bank loan charge one week prior to the preparation of the complaint and that the facts were supplied to him by the Assistant United States Attorney on the case.[45] This situation is similar to the one which existed in *Giordenello v. United States,* 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1957), since "the complaint contains no affirmative allegation that the affiant spoke with personal knowledge of the matters contained therein; it does not indicate any sources for the complainants' belief [other than the 1975 payroll records, which are insufficient]; and it does not set forth any other sufficient basis upon which a finding of probable cause could be made." *Id.* at 486. Neither the complaint nor the testimony indicates that Fisk had any personal knowledge or source information as to the conclusory statement concerning the falsity of Weisman's application,[46] nor do they set forth the facts to establish the criminal intent element of the crime charged. *See Pugach v. Klein,* 193 F.Supp. 630, 639 (S.D. N.Y.1961).

Although the Government alleges that at the time the complaint was prepared it had in its possession the federal tax returns of Weisman for 1975 and 1976, which indicated that in neither year did Weisman earn what was set forth in the loan application nor was his wife employed at the theatre, Fisk testified that he had reviewed only the 1975 return before executing the affidavit. Furthermore, information derived from the tax returns was not contained in the complaint, nor was it submitted to the magistrate in the form of sworn testimony, nor did Fisk have knowledge concerning Weisman's 1976 income. Therefore, the tax returns cannot be considered in determining probable cause; "an adequate basis for such a finding had to appear on the face of the complaint" (*Giordenello v. United States,* 357 U.S. 480, 487, 78 S.Ct. 1245, 1250, 2 L.Ed.2d 1503 (1957)) or from sworn testimony. Fed. R.Crim.P. 41(c). "It is elementary that in passing on the validity of a warrant, the reviewing court may consider *only* information brought to the magistrate's attention." (Emphasis in original). *Aguilar v. Texas, supra,* 378 U.S. at 109 n.1, 84 S.Ct. at 1511 (1963). A review of such information does not establish probable cause.

The absence of probable cause for the issuance of the warrant for the arrest of Weisman and the circumstances surrounding the arrest, require that his statements of September 16 be suppressed. The arrest afforded no lawful basis for procuring evidence with respect to an entirely different offense. *United States v. Edmons,* 432 F.2d 577, 582 (2d Cir. 1970).

---

45. Agent Fisk testified as follows:

Q Was it Mr. Akerman who said to you that the government had concluded that they wished to arrest Weisman on that bank loan fraud charge?

A Yes.

Q You certainly did not bring it to his attention.

A No. The facts were not—I wasn't in possession of the facts. Tr. 628, lines 5–12.

Q Did you tell the magistrate what he earned in 1976?

A No, I don't believe I did.

Q The charge, though, had to do with 1976, did it not?

A I presented the complaint on the approval of Mr. Akerman, who believed the probable cause, and it was signed, sir. Tr. 633, lines 18–25.

46. Agent Fisk testified as follows:

Q Mr. Fisk, was the Government's Exhibit 1 prepared by Mr. Akerman?

A Yes, it was.

Q It was typed at the U.S. Attorney's office?

A Yes, sir.

Q Did you make any changes on it?

A May I look at it, please?

Q Yes, sir.

A This additional statement was written in at the time.

Q You are referring now to the bottom of the last full paragraph on page 1, "These statements were knowingly false"?

A That's correct.

Q You wrote that?

A No, I did not.

Q Who did?

A Mr. Akerman.

Q Did you initial it?

A Yes. Tr. 635, line 17–636, line 12.

A major purpose for arresting Weisman on the bank loan charge was to obtain his cooperation on the investigation into the Theatre. This is borne out by testimony at the hearing, the circumstances of the arrest, including the Government's desire to keep others involved in the Theatre from knowing of the arrest, and the interrogation of Weisman immediately subsequent to his arrest almost solely as to the Theatre. Indeed, there is evidence that on September 12, 1978, the occasion of Weisman's testimony before the grand jury, Weisman's attorney had indicated to the Assistant United States Attorney that Weisman wished to cooperate.

The *Miranda* warnings given Weisman and his signature on a Waiver of Rights form do not cure the lack of probable cause and the need for suppression. *Brown v. Illinois*, 422 U.S. 590, 601–602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1974).

> Arrests made without warrant or without probable cause, for questioning or "investigation," would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings. (Quotations in original.)

*Id.* at 602, 95 S.Ct. at 2261. Therefore, even if the statements by Weisman were determined by this court to have been voluntary under the Fifth Amendment,[47] the causal connection between the illegal arrest and the statements must be broken in order to purge the primary taint. *Brown, supra* at 601–02, 95 S.Ct. 2254; *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1962). The determination of whether the statements were the product of free will must be determined by the facts of each case; "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant. [Footnotes and citations omitted.]" *Brown, supra* at 603–04, 95 S.Ct. at 2261–62.

Weisman's arrest, and the surrounding circumstances, were part of a plan to assure his cooperation on a totally unrelated investigation. "The arrest, both in design and execution, was investigatory." *Brown, supra* at 605, 95 S.Ct. at 2262. The questioning with respect to the Theatre was not merely incidental to the arrest, but one of the main purposes of the arrest.

■ However, a different issue is presented with respect to the statements made on Monday, September 19, 1977, more than two days after the illegal arrest. These statements fall somewhere between the second confession by the defendant in *Brown*, which was determined to be the result and fruit of the first, and that made by the defendant in *Wong Sun*, which was several days after the illegal arrest. To locate the September 19 statements on this spectrum all the surrounding facts and circumstances are relevant. *See Tanner v. Vincent*, 541 F.2d 932, 936 (2d Cir. 1976), *cert. denied*, 429 U.S. 1065, 97 S.Ct. 794, 58 L.Ed.2d 782 (1977); *United States v. Toral*, 536 F.2d 893, 896 (9th Cir. 1976).

> [A]fter an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed.

*United States v. Bayer*, 331 U.S. 532, 540–41, 67 S.Ct. 1394, 1398, 91 L.Ed. 1654 (1946).

A review of the facts and circumstances indicates that the conditions which made Weisman's first statements inadmissible did not carry over to invalidate the subsequent

---

47. Due to the suppression based upon the Fourth Amendment this court need not address this issue.

statements. The second meeting was held over two days after Weisman's arrest. Weisman had been arraigned on the bank loan charge and released on his own recognizance. The meeting at which the statements were made took place at a motel chosen by Weisman and not in FBI headquarters. Weisman appeared on his own. Weisman's wife was not present, and there was no immediate threat of her arrest. Weisman was again given his *Miranda* warnings and signed a Waiver of Rights form. These intervening circumstances dissipated the original taint; there was a sufficient break in the stream of events to insulate the later statements. *Clewis v. Texas*, 386 U.S. 707, 710, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1966).

Furthermore, Weisman is a sophisticated businessman who was fully aware of his rights and who had just testified before the grand jury and had consulted counsel in connection with that testimony. He had an opportunity over the weekend to consult with his attorney or anyone else, although there is no testimony before this court that he did so. His statements of September 16 were not recorded, other than some sketchy notes by one agent, and he signed no written confession or similar document. The statements at the second meeting appear to have resulted from a voluntary and informed decision by Weisman to cooperate with the Government, *cf. United States v. Galante*, 547 F.2d 733 (2d Cir. 1976), *cert. denied*, 431 U.S. 969, 97 S.Ct. 2930, 53 L.Ed.2d 1066 (1977); *United States v. Mullens*, 536 F.2d 997 (2d Cir. 1976), and not stimulated by a belief that he had nothing to lose. *See generally Knott v. Howard*, 511 F.2d 1060 (1st Cir. 1975). They were not the direct result and fruit of the first *Brown, supra* at 605; nor were they obtained in violation of his Fifth or Sixth Amendment rights. The September 19, 1977 statements of Weisman will not be suppressed.

SO ORDERED.